George R. CAESAR, M.D.,
Petitioner-Appellant,

v.

Louis P. MOUNTANOS, as Sheriff of the County of Marin, State of California, et al., Respondents-Appellees.

No. 74–2271.

United States Court of Appeals,
Ninth Circuit.

Sept. 13, 1976.

Kurt W. Melchior (argued), of Severson, Werson, Berke, & Melchior, San Francisco, Cal., for petitioner-appellant.

James D. Hammond (argued), of Bacon, Stone, O'Brien, & Hammond, San Francisco, Cal., for respondents-appellees.

Before KOELSCH and HUFSTEDLER, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

Petitioner, Dr. George R. Caesar, a licensed psychiatrist practicing in California, has appealed from an order denying his petition for writ of habeas corpus seeking to set aside a contempt adjudication and sentence in the California Superior Court, Marin County.[1] He was adjudged in contempt for refusing to obey an order directing him to answer questions relating to communications with a former patient, based on "patient-litigant exception" to the psychotherapist-patient privilege, contained in California Evidence Code § 1016.[2] Petitioner contends that § 1016 violates "rights of privacy, due process and equal protection which exist under the Constitution of the United States".[3] In a detailed and well reasoned opinion the Supreme Court of California rejected this contention in *In Re Lifschutz*, 2 Cal.3d 415, 85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1 (1970), and upheld the validity of § 1016. We agree with the conclusions of the court in *In Re Lifschutz* and affirm the order of the district court.

### Background

In December 1969, Joan Seebach was referred to Dr. Caesar for psychiatric examination and treatment following an automobile accident on December 4, 1969. Dr. Caesar saw her approximately 20 times for psychotherapy. Miss Seebach had been in another automobile accident on August 30, 1968. She filed separate actions to recover damages for both accidents in July and August, 1970. In her complaints Miss Seebach alleged that the accidents caused her personal injury and pain and suffering not limited to her physical ailments. She alleged further that she had incurred medical expenses and loss of income in amounts not fully ascertainable at that time. In a deposition in one of the cases, taken on June 15, 1971, Miss Seebach and her counsel indicated that "some of the care and treatment" given by Dr. Caesar "may be involved in this lawsuit".[4] Another psychiatrist in a deposition testified that Miss Seebach's attending physicians had recommended referral to Dr. Caesar because they felt there was "an emotional overlay" to her problems and that she was "magnifying her distress".[5]

The two actions were consolidated for trial, and Dr. Caesar's deposition was taken on April 5, 1972. He testified that he had given his notes on Miss Seebach to her counsel. He refused to answer any questions regarding his treatment of Miss Seebach, stating that in his judgment "answering further questions and revealing her con-

*. Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

1. Commitment was stayed pending appellate review in the California and Federal courts. A writ of certiorari was denied by the California Court of Appeal, First Appellate District, Division Four, and a hearing was denied by the Supreme Court of California.

2. § 1016 relating to "Patient-litigant exception" reads in pertinent part:
 "1016. There is no privilege under this article as to a communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by:
 (a) The patient;"

3. The California State Psychological Association has filed an amicus curiae brief in support of petitioner's position.

4. Counsel for Miss Seebach stated that his client had been referred to Dr. Caesar because her attending physician felt that her condition might be the result of a conversion reaction or depressive reaction, and that there was some difference of opinion between some of the treating physicians and Miss Seebach and her counsel. Miss Seebach then said, "You have to see the total picture, because due to these accidents, my life style has changed considerably".

5. The psychiatrist said further that she understood that Dr. Caesar had traced some of Miss Seebach's emotional problems to her early childhood.

fidences could be harmful to her psychologically, and detrimental to her future well-being". Caesar indicated that he had not received "valid consent" from Miss Seebach which would permit him to testify. Counsel for Miss Seebach then told Caesar that she was no longer his patient and that although there had been some prior confusion about Miss Seebach's consent, she had authorized counsel to stipulate that consent for Caesar to testify had been given. Caesar refused to accept this consent and stated further that even if written consent were given he would still refuse to testify. Subsequently, Miss Seebach filed a notice revoking her waiver of the psychotherapist-patient privilege.

Following a hearing an order was entered in the Marin County Superior Court on October 18, 1972 requiring Dr. Caesar to give his deposition. The court held that under § 1016, as construed in *In Re Lifschutz,* Miss Seebach had waived the psychotherapist-patient privilege when she placed her "mental or emotional condition" in issue by "claiming damages for mental and emotional distress". At a second deposition on November 27, 1972 Dr. Caesar acknowledged that he had treated Miss Seebach for injuries she had sustained in the accidents and that he had diagnosed her condition as depressed. He refused, however, to answer eleven questions concerning the relationship of her emotional condition to the accidents. The contempt order followed on December 12, 1972.[6] After petitioner had exhausted his state court remedies, he sought relief in federal court. In denying his petition, the district court held that § 1016 was not unconstitutional, did not invade any rights of privacy of petitioner or his patient, and that the contentions of petitioner should be addressed to the State Legislature rather than the courts.

### Contentions on Appeal

Under California Evidence Code § 1014 a psychotherapeutic patient has the privilege to refuse to disclose and to prevent others from disclosing confidential communications between the patient and doctor. § 1015 allows the psychotherapist to claim the privilege of his patient when information about a confidential communication is sought. However, as noted *supra,* § 1016 provides, "There is no privilege under this article as to communications relevant to an issue concerning the mental or emotional condition of the patient if such an issue has been tendered by: (a) The patient . . ."

In attacking the validity of § 1016, petitioner contends that (1) there is an absolute constitutional protection for communications between patients and their psychotherapists of the type sought from Dr. Caesar, based on the right of privacy; (2) § 1016 violates the Equal Protection Clause of the Fourteenth Amendment in that (a) psychotherapeutic patients are deprived of rights afforded other litigants, and (b) § 1016 "discriminates unreasonably between those who seek out psychotherapists and those who seek out clergymen for the relief of emotional distress"; and (3) § 1016 is unjustified by any compelling state interest and is not narrowly drawn to express only the legitimate state interest at stake. Virtually all of these issues were considered in *Lifschutz.* It is contended, however, that the California court reached the wrong result in *Lifschutz* and that its decision "cannot withstand more current constitutional scrutiny", particularly in the light of the broader reach of doctor-patient privacy recognized in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

### The Lifschutz Decision

*Lifschutz,* a psychiatrist, was placed in custody for refusing to obey a discovery order issued by a trial judge pursuant to California Evidence Code § 1016. In *Lifschutz,* as here, the patient had tendered his mental and emotional condition in issue in a lawsuit, thus activating a waiver of the psychotherapist-patient privilege under the

---

**6.** The order of the Superior Court required Caesar to answer only those questions which he refused to answer at the November 27 deposition.

statute. The California Supreme Court denied Lifschutz's petition for habeas corpus, holding that the federal constitution did not establish an absolute privilege for psychotherapeutic communications. The court construed § 1016 to require disclosure only of information directly pertinent to issues raised by the patient in a lawsuit and held that in applying the section, the psychotherapeutic privilege should be liberally construed in favor of the patient. When so limited, the court found that the statute did not constitute an impermissible invasion into the sphere of privacy encompassing the doctor-patient relationship in light of the various interests which must be balanced.[7]

### Absolute Privilege

Petitioner relies, as did Dr. Lifschutz, on the fundamental right of privacy encompassing the doctor-patient relationship. This right of privacy, the psychotherapists contend, must be construed to provide an absolute privilege for psychotherapeutic communications because of the nature of the relationship, depending, as it does, on the patient's complete confidence in the psychotherapist.[8] The *Lifschutz* court found this argument to raise serious and meritorious issues. The court held, however, that *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the leading decision on doctor-patient rights at the time *Lifschutz* was decided, did not prohibit all state interference in the doctor-patient relationship but instead left room for some state regulation. The *Lifschutz* court recognized, as we do, that psychotherapy is perhaps more dependent on absolute confidentiality than other medi-

cal disciplines. In interpreting § 1016 the court was "mindful of the justifiable expectation of confidentiality that most individuals seeking psychotherapeutic treatment harbor" 85 Cal.Rptr. at 839, 467 P.2d at 567. The court noted, however, that psychotherapy had not been destroyed but rather had flourished in the face of § 1016 and similar statutes which establish less than absolute psychotherapist-patient privilege. The court concluded that the constitution does not provide psychotherapists with an absolute right of privacy but permits limited intrusion into the psychotherapist-patient privilege when properly justified.

Petitioner contends that because the court in *Lifschutz* did not have the benefit of the more recent analysis of the doctor-patient relationship in *Roe v. Wade, supra,* and *Doe v. Bolton, supra,* the *Lifschutz* opinion is subject to re-examination and correction.[9] We disagree. Both the *Roe* and *Doe* decisions spoke of and relied upon a conditional right of privacy in the doctor-patient relationship. As the Court in *Roe*, 410 U.S. at 153–54, 93 S.Ct. at 727, noted after reviewing a long line of privacy cases, "The Court's decisions recognizing a right of privacy also acknowledge that some state regulation in areas protected by that right is appropriate." *Roe* held that interference with the doctor-patient relationship could be justified upon the showing of a "compelling state interest". *Roe*, 410 U.S. at 163, 93 S.Ct. 705. Similarly the court in *Lifschutz* recognized that it was dealing with a qualified right which could be infringed upon a showing of an "important state interest". The analytical methodology fol-

---

7. Under a different factual situation the Supreme Court of California reaffirmed its conclusion in *Lifschutz* iin *Tarasoff v. Regents of University of California,* 118 Cal.Rptr. 129, 529 P.2d 553 (in banc, 1974). In *Tarasoff* the court construed California Evidence Code § 1024, involving another exception to the psychotherapist-patient privilege. Two members of the court dissented.

8. Petitioner's claim "is limited to protection against compelled disclosures in the course of civil proceedings of psychotherapeutically obtained communications". It does not involve a claim of absolute confidentiality in the con-

text of a patient's apparent propensity to violence (see *Tarasoff v. Regents,* n. 6), nor the right to compel disclosure in criminal proceedings.

9. We agree, as did the court in *Lifschutz,* that the right of privacy encompassing the doctor-patient relationship identified and explained in *Griswold, Roe,* and *Doe* goes beyond the factual context of those cases, i. e., intimate marital and sexual problems, and extends to psychotherapist-patient communications. The question is whether that right is absolute.

lowed by *Lifschutz* is essentially the same as that followed in *Roe* and *Doe* and may be properly applied here. We have no doubt that the right of privacy relied on by Dr. Caesar is substantial. However, the right is conditional rather than absolute and limited impairment of that right may be allowed if properly justified.[10]

### Violation of Equal Protection Clause

■ Petitioner argues that § 1016 conflicts with the Equal Protection Clause in two ways: (1) by placing a pre-condition on psychotherapeutic patients' access to the courts, § 1016 deprives them of rights afforded other litigants; and (2) by establishing an absolute privilege for clergyman-penitent communications in § 1034, the State impermissibly discriminates between those who seek clergymen for counseling and those who consult psychotherapists. We find that both contentions were adequately considered and correctly dealt with in *Lifschutz.*

■ The court in *Lifschutz* noted that § 1016 neither contemplates a complete waiver of the psychotherapeutic communication privilege nor seeks to deter psychotherapy patients from instituting lawsuits. As construed in *Lifschutz,* disclosure is strictly limited to that information placed in issue by the plaintiff himself and about which he and his psychotherapist have practically exclusive knowledge.[11] Although

the effect of the section may be to require litigants to make some hard choices before bringing a lawsuit and may in fact discourage some legal actions, a state may place formal and procedural requisites on litigants without violating their constitutional rights to judicial process as long as the state's action is based upon a proper consideration of the nature of the proceedings and interests involved. See, *Boddie v. Connecticut,* 401 U.S. 371, 377–378, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).[12] Every person who brings a lawsuit under our system of jurisprudence must bear disclosure of those facts upon which his claim is based. Section 1016, rather than discriminating improperly against psychotherapy patients, instead places them on the same footing as other litigants.

Concerning the difference between the privileges granted clergymen and psychotherapists, the *Lifschutz* court concluded that the distinction did not render the California statutes unconstitutional. The court noted that each of the evidentiary privileges recognized by law is subject to different exceptions based upon the nature of the relationships involved.[13] The attorney-client privilege is subject to exception in several instances, as, for example, when a lawyer is contacted by the client for criminal purposes or where an issue of the lawyer's duty to his client is raised. Calif.Evid. Code §§ 956–962. The marital communica-

---

**10.** Petitioner also relies on *Roe v. Ingraham,* 480 F.2d 102 (2 Cir. 1973). *Ingraham,* however, applied the same balancing test as utilized in *Roe v. Wade, supra,* and held that while prescription records fall within the area protected by the right of privacy, that right is not absolute and may be subject to state regulation. 480 F.2d at 108.

**11.** As we note *infra,* we doubt that having the patient-litigant referred to another psychotherapist for diagnostic examination can substitute for the information the treating psychotherapist can provide about the patient.

**12.** *Boddie* held that a state could not impose court filing fees which had the effect of discriminating against litigants on the basis of wealth, stating that " 'within the limits of practicability' . . . a State must afford to all individuals a meaningful opportunity to be heard". 401 U.S. at 379, 91 S.Ct. at 786. Here

neither the patient nor petitioner has been deprived of a meaningful hearing.

**13.** Under the common law a person was required to give testimony upon all facts inquired of in a court of law and few, if any, testimonial privileges were allowed. Those privileges which have developed are based upon the existence of four fundamental conditions: (1) the communication must originate in confidence; (2) confidentiality must be essential; (3) the confidential relationship must be one which ought to be fostered; and (4) the injury resulting from disclosing the information must be greater than the benefit gained by disclosure. 8 Wigmore, Evidence § 2285 (McNaughton Rev.1961). Wigmore raises serious doubts about the existence of the fourth element with regard to patient-physician communications.

tion privilege is inapplicable where one spouse injures another or in actions for alienation of affection. Calif.Evid.Code §§ 972, 981–986. The physician-patient privilege, like the psychotherapist-patient privilege, is not applicable where the patient places his physical condition at issue in a lawsuit. Calif.Evid.Code § 996. Each of these exceptions to the general grant of evidentiary privilege has been created by the State Legislature in an effort to accommodate and balance the various interests involved. See 8 Wigmore, Evidence § 2285, *et seq.*, (McNaughton Rev.1961). The clergyman-penitent privilege was recognized in *Lifschutz* as being a necessary "accommodation by the secular state to strongly held religious tenets of a large segment of its citizenry." 85 Cal.Rptr. at 837, 467 P.2d at 565. This need for accommodation, coupled with the difference between the nature of the services performed by clergymen and psychotherapists, can warrant the Legislature's decision to treat the two professions differently.

Like the court in *Lifschutz* we decline to pass on the question of whether the accommodation granted by § 1034 can be reconciled with the Establishment Clause. Petitioner has standing only to raise issues with respect to the constitutionality of § 1016. That section is not invalid because it fails to grant psychotherapists the same privileges granted clergymen and members of other learned professions.

### Compelling State Interest

Where "fundamental rights" are involved, "regulation limiting these rights may be justified only by a 'compelling state interest'," and "legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." *Roe v. Wade,* 410 U.S. at 155, 93 S.Ct. at 728. Petitioner contends that there is no demonstrable compelling interest to support § 1016 and it is, therefore, constitutionally invalid. We disagree. As Mr. Justice White stated in his concurring opinion in *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 93–94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964):

"Among the necessary and most important of the powers of the states as well as the Federal Government to assure the effective functioning of government in an ordered society is the broad power to compel residents to testify in court or before grand juries or agencies. See *Blair v. United States,* 250 U.S. 273 [39 S.Ct. 468, 63 L.Ed. 979] (1919). Such testimony constitutes one of the Government's primary sources of information."

The state has a compelling interest to insure that truth is ascertained in legal proceedings in its courts of law. This interest has been held to be sufficient to require newsmen to testify before grand juries concerning privileged information, *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), to compel testimony from witnesses invoking the Fifth Amendment privilege against self-incrimination once immunity has been given, *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and to require witnesses before grand juries to testify concerning illegally obtained evidence, *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). California's interest in requiring psychotherapists to produce limited disclosure of confidential communications is adequately supported by a compelling interest under current constitutional standards.

### Is Section 1016 "Narrowly Drawn"?

In *Lifschutz,* the court rejected the broad effect of § 1016 urged by petitioner and concluded that the section "must be construed not as a complete waiver of the privilege but only as a limited waiver concomitant with the purposes of the exception". The court continued: "Under section 1016 disclosure can be compelled only with respect to *those mental conditions* the patient-litigant has 'disclose[d] . . . by bringing an action in which *they* are at issue' (*City & County of San Francisco v. Superior Court,* supra, 37 Cal.2d 227, 231 P.2d 26 (1951); communications which are not directly relevant to those specific conditions do not fall within the terms of section

1016's exception and therefore remain privileged". 85 Cal.Rptr. at 842, 467 P.2d at 570.[14]

The court in *Lifschutz* noted also that California Code of Civil Procedure, § 2019(b) grants the trial court broad discretion to issue protective orders which justice requires to protect the party and witness, and that, "as with any evidence, the court retains discretion to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, . . .' (Evid. Code, § 352)" 85 Cal.Rptr. at 844, 467 P.2d at 572. These safeguards and the express limitation in the statute itself afford protection for both the patient and psychotherapist sufficient to withstand a constitutional attack.

Miss Seebach has clearly raised before the court the issue "concerning [her] mental and emotional condition" and is seeking damages for mental and emotional injuries resulting from the accidents. She was examined and treated by Dr. Caesar for emotional distress and depression following the second accident. He testified that he had an opinion "with respect to whether Miss Seebach suffered from any emotional distress of any kind as a result of her having been in the two accidents", but he declined to state what the opinion was. The eleven questions Dr. Caesar declined to answer all related directly to his opinion regarding whether Miss Seebach suffered emotional distress or depression from the accidents, whether any condition Dr. Caesar found was the result of a combination of the accidents and other factors in her life, and whether the psychological factors he found played a role in the origin or aggravation of the cervical pain which Miss Seebach testified she was suffering from. The questions were all clearly relevant and related directly to the issue of her mental and emotional condition which Miss Seebach herself had raised. Although Miss Seebach later consulted another psychiatrist for diagnosis prior to trial, the new psychiatrist obviously could not substitute for the treating psychotherapist since she was unable to testify with respect to Miss Seebach's condition when she was examined by Dr. Caesar or any change in condition during the rather extended period of psychotherapy.

### Conclusion

We conclude that under prevailing constitutional standards § 1016 as interpreted by the Supreme Court of California in *Lifschutz* strikes a proper balance between the conditional right of privacy encompassing the psychotherapist-patient relationship and the state's compelling need to insure the ascertainment of the truth in court proceedings. The plaintiff has placed her mental and emotional condition in issue. By raising this issue she herself has breached the confidential relationship and made her emotional problems known to the public. Having so acted, the patient and her psychiatrist should not now be permitted to rely upon an absolute privilege which would preclude a proper determination of the truth of the plaintiff-patient's allegations. The disclosure required by § 1016 is mandated in the interests of a fair adjudication of the issues raised.

The judgment of the district court denying the petition for habeas corpus is affirmed.

HUFSTEDLER, Circuit Judge (concurring and dissenting):

I part company with *In re Lifschutz* (1970) 2 Cal.3d 415, 85 Cal.Rptr. 829, 467 P.2d 557, and hence with the majority opinion in this case, only in the holding that California Evidence Code Section 1016, as construed in *Lifschutz* and applied here,

---

**14.** The court said further: "Disclosure cannot be compelled with respect to other aspects of the patient-litigant's personality even though they may, in some sense, be 'relevant' to the substantive issues of litigation. The patient thus is not obligated to sacrifice all privacy to seek redress for a specific mental or emotional injury; the scope of the inquiry permitted depends upon the nature of the injuries which the patient-litigant himself has brought before the court."

does not impermissibly encroach upon the patient's constitutional right of privacy. *Lifschutz* incorrectly assessed the weight of the patient's right of privacy as against competing public and private interests in the production of relevant evidence in personal injury litigation; the means adopted in *Lifschutz* to ameliorate the impact of Section 1016 upon the patient's right of privacy are not sufficiently sensitive to withstand constitutional scrutiny.

Section 1016 provides that "[t]here is no privilege under this article as to a communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by (a) [t]he patient . . . ." "Confidential communication" is defined in Section 1012 as "information, including information obtained by an examination of the patient, transmitted between a patient and his psychotherapist in the course of that relationship and in confidence by a means which, so far as the patient is aware, discloses the information to no third persons . . ., and includes advice given by the psychotherapist in the course of that relationship."

As construed in *Lifschutz,* "communications between patient and psychotherapist, diagnosis by the psychotherapist, and advice given during the therapy relationship [are] privileged communications." (*Id.* 2 Cal.3d at 429–30, 85 Cal.Rptr. at 838, 467 P.2d at 566.) The questions that Dr. Caesar refused to answer all fall within the privileged communications ambit.[1]

*Lifschutz* recognized that the psychotherapeutic patient's interest in keeping secret confidential communication with his therapist "has deeper roots than the California statute and draws sustenance from our constitutional heritage. In *Griswold v. Connecticut* . . ., the United States Supreme Court declared that 'Various guarantees [of the Bill of Rights] create zones of privacy,' and we believe that the confidentiality of the psychotherapeutic session falls within one such zone." (*In re Lifschutz, supra,* 2 Cal.3d at 431–32, 85 Cal.Rptr. at 839, 467 P.2d at 567.) The confidential communications between a psychotherapeutic patient and his doctor have the indicia to place those communications squarely within the constitutional right of privacy. Psycho-

1. 1. "Did he [Dr. Klemme] say why, in his opinion it [a talk with Dr. Caesar] might be helpful to her?

2. [A]t the last time or at the occasion of your last consultation with her, would you describe her mental condition as being one of mild depression pertaining to the—or as a result of the physical injuries which she says that she was suffering from as a result of the three accidents which I previously referred to?

3. Would you please state what that opinion is, Doctor? [With respect to whether Miss Seebach suffered from any emotional distress of any kind as a result of her having been in those two accidents.]

4. [D]id you notice an improvement with respect to the degree of her depression over the period of time that she was under your treatment?

5. [A]re you able, Doctor, to relate the condition which you've described concerning the state of Miss Seebach's depression or the degree of Miss Seebach's depression at the time of your initial two interviews to any particular trauma or incident that may have occurred in her life?

6. Do you have an opinion as to whether or not the depression which you've described that existed at the time of your initial two interviews related to trauma that Miss Seebach suf-

fered as a result of the two accidents in which she was involved, that you now recall?

7. Will you state what that opinion is?

8. [D]id you form an opinion immediately subsequent to your initial two interviews with Miss Seebach at the hospital concerning any emotional distress which she might have been suffering from which directly related to the two accidents which we've previously referred to in which she was involved?

9. Doctor, did you, during the course of your treatment of Miss Seebach—and by 'course,' I mean all of your interviews and consultations with her—form any opinion that her condition, mental or emotional condition, did not, in any way, relate to the accident in which she was involved and which you have knowledge of?

10. . . . whether the state of depression was a result of the combination of the accidents in which she was involved which you now recall and other factors in her life?

11. After the letter, [to another doctor which said he could not say whether psychological factors played a role in the back pain] did you form an opinion as to whether or not psychological factors played a role in the origin or aggravation of the cervical pain which Miss Seebach said that she was suffering from?"

therapy probes the core of the patient's personality. The patient's most intimate thoughts and emotions are exposed during the course of the treatment. " 'The psychiatric patient confides [in his therapist] more utterly than anyone else in the world. . . [H]e lays bare his entire self, his dreams, his fantasies, his sin, and his shame.' " (*Taylor v. United States* (1955) 95 U.S.App.D.C. 373, 222 F.2d 398, 401, *quoting* Guttmacher and Weinhofen, Psychiatry and the Law 272 (1952).) The patient's innermost thoughts may be so frightening, embarrassing, shameful or morbid that the patient in therapy will struggle to remain sick, rather than to reveal those thoughts even to himself. The possibility that the psychotherapist could be compelled to reveal those communications to anyone, let alone to broadcast them in a legal proceeding, can deter persons from seeking needed treatment and destroy treatment in progress. (*See, e. g., Taylor v. United States, supra;* J. Katz, J. Goldstein, & A. Dershowitz, Psychotherapy, Psychoanalysis and the Law 726–727 (1967).)

The Supreme Court has severely restricted state intrusion into zones of privacy that have one or more of these elements that inhere in the treatment relationship between the patient and his psychotherapist. (*E. g., Planned Parenthood of Central Missouri v. Danforth* (1976) —— U.S. ——, 96 S.Ct. 2831, 49 L.Ed.2d 788 (right to privacy in the physician-patient relationship in the context of woman patient's decision to have an abortion without parental or spousal consent); *Doe v. Bolton* (1973) 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (the right of personal and marital privacy; privacy in the physician-patient relationship; privacy in human sexuality in the abortion setting); *Roe v. Wade* (1973) 410 U.S. 113, 93 S.Ct.

705, 35 L.Ed.2d 147 (similar to *Doe*); *Eisenstadt v. Baird* (1972) 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (privacy in human sexual relations; prohibition on contraception; state interest in health). *See also, Stanley v. Georgia* (1969) 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (fundamental right to satisfy intellectual and emotional needs in the privacy of one's home); *United States v. Twelve 200–Ft. Reels of Super 8MM Film* (1973) 413 U.S. 123, 127, 93 S.Ct. 2665, 2668, 37 L.Ed.2d 500, n.4; (spheres of constitutionally protected privacy encompass "the intimate medical problems of family, marriage, and motherhood"); *Poe v. Ullman* (1961) 367 U.S. 497, 538, 552, 81 S.Ct. 1752, 1774, 6 L.Ed.2d 989 (Harlan, J. dissenting) (state interference in sexual conduct of married couples held intolerable invasion of privacy).) Communications between a patient and his or her psychotherapist often involve intimate medical problems of family, marriage, motherhood and fatherhood, human sexuality, and almost always concern strong emotional needs of the patient.

This sensitive zone of privacy is protected as a fundamental constitutional right.[2] Although the right is not absolute, it enters the combat zone heavily armed. It will yield only to a compelling state interest, and then will give ground only to the extent necessary to protect a compelling adverse interest. (*E. g., Planned Parenthood of Central Missouri v. Danforth, supra; Roe v. Wade, supra,* 410 U.S. at 163, 164, 93 S.Ct. 705. *See also Friendship Medical Ct. Ltd. v. Chicago Board of Health* (7th Cir. 1974) 505 F.2d 1141; *Word v. Poelker* (8th Cir. 1974) 495 F.2d 1349; *Roe v. Ingraham* (S.D.N.Y.1975) 403 F.Supp. 931, *prob. juris. noted sub nom., Roe v. Whalen* (1976) 424 U.S. 907, 96 S.Ct. 1100, 47 L.Ed.2d 310. *Cf.*

**2.** *Lifschutz* did not address the question whether confidential communications within the protection of a constitutional right of privacy were "fundamental" or whether the patient's right could be overcome by interests less weighty than "compelling." One explanation is that the court did not have the benefit of the post-*Griswold* decisions. Another factor was that the particular questions that Dr. Lifschutz refused to answer were only preliminary and did

not reach the critical zone of privacy constitutionally protected. "The questions posed to Dr. Lifschutz, however, have inquired only into whether he treated [the patient-plaintiff], and whether he possessed records regarding this patient. Defendant has not yet asked Dr. Lifschutz about the nature of his treatment of the plaintiff, his diagnosis, or the content of any communication." (*Id.* 2 Cal.2d at 430, 85 Cal. Rptr. at 839, 467 P.2d at 567.)

*Runyan v. McCrary* (1976) —— U.S. ——, 96 S.Ct. 2586, 49 L.Ed.2d 415; *Wisconsin v. Yoder* (1973) 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15; *Meyer v. Nebraska* (1923) 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042.)

The contest is not simply between the state's interest in "facilitating the ascertainment of truth in connection with legal proceedings" (*In re Lifschutz, supra,* 2 Cal.2d at 432, 85 Cal.Rptr. at 840, 467 P.2d at 568) and the patient's interest in protecting his privacy. If it were, the patient's interest in his privacy would easily prevail over the state's general interest in the production of relevant evidence in a routine personal injury case. The public and private interests that are involved are more complex. The state is interested in effective access to the courts and in fair trials with respect to both plaintiffs and defendants in civil litigation. On the patient-plaintiff's side, the state also has interests in the deterrent effect of civil litigation upon potential tort-feasors, in the health of its citizens, and in the protection of privacy of its citizens.[3] The economic interests of the plaintiff and defendant are also at stake.

The privilege sections of the California Evidence Code, including Section 1016, attempt to strike an appropriate balance between these competing interests. *Lifschutz* recognized that Section 1016 was not finely enough tuned to give adequate protection to the patient's right to protect his confidential communications. The court tried to avoid constitutional difficulties with Section 1016 by construing it "not as a complete waiver of the privilege but only as a limited waiver concomitant with the purposes of the exception. Under section 1016 disclosure can be compelled only with respect to *those mental conditions* the patient-litigant has 'disclose[d] . . . by

bringing an action in which *they* are in issue' . . . ; communications which are not directly relevant to those specific conditions do not fall within the terms of section 1016's exception and therefore remain privileged." (Emphasis in original. *Id.* 2 Cal.3d at 435, 85 Cal.Rptr. at 842, 467 P.2d at 570.) The problem is that this formulation is almost impossible to apply, and, to the extent that it can be sufficiently refined to be able to apply it, the relevance test impermissibly encroaches on the patient's zone of protected privacy.

The court in *Lifschutz* ran into immediate trouble trying to apply its test to Lifschutz. The plaintiff's complaint there, as here, contained the typical allegations of "mental and emotional distress" arising from the tort and did not "specifically identify the nature of the 'mental or emotional condition' at issue." (*Id.* 2 Cal.3d at 436, 85 Cal.Rptr. at 843, 467 P.2d at 571.) The court confessed that it could not tell whether the ten-year old therapeutic treatment involved had any relevance, direct or not, to the mental conditions in issue. The court then shifted the burden to the plaintiff-patient to extricate himself from this dilemma by requiring "the patient initially to submit some showing that a given confidential communication is not directly related to the issue he has tendered to the court." (*Id.* 2 Cal.3d at 436, 85 Cal.Rptr. at 843, 467 P.2d at 571.) This will not do.

The layman-patient simply cannot be expected to diagnose his own illness, to determine for himself what mental conditions are in issue in the lawsuit, or to decide what evidence is or is not "directly" related to the issue. Even a medically trained patient turned personal injury lawyer would be hard pressed in territory less slippery than mental health to prove the negative *Lifschutz* imposes upon him.

---

3. The state as well as the individual has an interest in preserving the constitutional right of privacy. Any society that is unable to preserve to its members the autonomy of their personalities cannot long endure. A free society cannot exist at all without according substantial protection to the privacy of its citizens. (*E. g.,*

*Boyd v. United States* (1886) 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746; *Olmstead v. United States* (1928) 277 U.S. 438, 464–65, 478–79, 48 S.Ct. 564, 72 L.Ed. 944 (Holmes & Brandeis, J.J., dissenting). A. Westin, Privacy and Freedom 8–63, 330–38 (1st ed. 1967); Fried, "Privacy," 77 Yale L.J. 475 (1968).)

Moreover, as *Lifschutz* expressly and impliedly acknowledges, the patient must disclose at least part of the contents of the protected communications to his lawyer and to the trial judge as a condition to retaining the confidentiality of the communication. Disclosure of matters within the constitutionally protected zone is thus compelled by Evidence Code Section 1016, as construed in *Lifschutz*, as a condition to the patient's access to the court in seeking redress for his or her injuries in any case in which his or her mental condition is arguably in issue. In routine personal injury cases, like that asserted by Dr. Caesar's patient, the plaintiff-patient must forego any potential recovery for emotional or mental distress (and possibly for pain and suffering, which have at least some mental elements [4]) to protect the confidentiality of communications to his or her psychotherapeutic doctor. In other cases, such as those based on intentional infliction of emotional distress, the plaintiff-patient must abandon any claim for redress because emotional distress is both an essential element of the tort and the primary and often the sole damage suffered.

*Lifschutz* says that the compulsion imposed by Section 1016 is justified because "the patient's own action initiates the exposure" and the " 'intrusion' into a patient's

privacy remains essentially under the patient's control." (2 Cal.3d at 433, 85 Cal. Rptr. at 840, 467 P.2d at 568.) The implication is that constitutional infirmities disappear because the patient waives his right of privacy when he seeks legal redress for his injury. There is nothing voluntary about the injury suffered. The injured patient "controls" the "intrusion" only in the sense that he can give up redress instead of seeking legal relief for the injury. If he seeks redress for his injury, relinquishment of his constitutionally protected zone of privacy is in no sense voluntary; Section 1016 compels him to choose between his privacy and his right to seek legal redress. That Hobson's choice is not a waiver; as California Evidence Code Section 912(a) acknowledges, a waiver of the privilege must be "without coercion." [5]

In short, the *Lifschutz'* effort effectively to narrow Section 1016 is a failure. Although no formula in this context will be completely successful, I propose means for restricting Section 1016 which, I believe, more adequately protect the patient's privacy right without unduly curbing a civil defendant's access to evidence. As applied to civil personal injury litigation, I would restrict the concept of relevance used in Section 1016 ("There is no privilege under this article as to a communication relevant to an

**4.** *E. g., Roberts v. Superior Court of Butte County* (1973) 9 Cal.3d 330, 107 Cal.Rptr. 309, 508 P.2d 309. The California Supreme Court upheld an attempted limitation on mental condition. The plaintiff alleged that she was "sick, sore, lame and disabled," but she did not allege an emotional distress claim to the extent that her psychiatrist had to testify, even though "sore" and "disabled" might have emotional connotations. Roberts thereby avoided airing her severe emotional problems, but simultaneously forfeited any recovery for emotional trauma due to the alleged tort.

**5.** Dr. Caesar and the majority have each advanced waiver theories. The majority says that putting in a claim for pain and suffering waives the right to privacy in respect of information relevant thereto. Dr. Caesar counters that it is impermissible to force Seebach to either "delimit" her claim, or waive her privacy right. Neither argument resolves the dilemma, because the issue is not whether there is any waiver at all, but the extent of the waiver; *i. e.,*

the mechanics of deciding what is relevant. In addition, even if *Boddie v. Connecticut* (1971) 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 equips Seebach with a due process right of access to the courts (*see Wiren v. Eide* (9th Cir. 1976) 542 F.2d 757), a dubious proposition (*Ortwein v. Schwab* (1973) 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572; *United States v. Kras* (1973) 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626; *Ad Hoc Comm. on Jud. Admin. v. Massachusetts* (1st Cir. 1973) 488 F.2d 1241, 1244 n.3) it is juxtaposed against the defendants' equally insistent due process right to maximum relevant evidence. (*Cf. United States v. Nixon* (1974) 418 U.S. 683, 711, 94 S.Ct. 3090, 41 L.Ed.2d 1039.) Dr. Caesar's second waiver theory, that a psychotherapeutic patient, advised by counsel with a palpable financial interest in the case, cannot make a knowing waiver is irrelevant. We are not dealing with Seebach's actual waiver—which was revoked—but with the implied-in-law waiver made by claiming pain and suffering.

issue concerning the mental or emotional condition of the patient if such issue has been tendered by: (a) the patient . . ..") as follows: No confidential communication between a psychotherapeutic patient and his treating doctor shall be deemed relevant for the purpose of Section 1016, except the fact of treatment, the time and length of treatment, the cost of treatment, and the ultimate diagnosis, unless the party seeking disclosure of the communication establishes in the trial court a compelling need for its production.

The restriction is limited to treating doctors. Health of the patient is a primary consideration only in the treatment situation. Moreover, the protection of privacy is critical in the context of treatment. A personal injury plaintiff who consults a psychotherapist for examination and diagnosis can reasonably be expected to know that his communications with the psychotherapist will not be privileged. The primary, if not the sole purpose, of the psychotherapist and the patient in the nontreatment setting is to secure the opinion of the doctor for the purpose of transmitting that information to third persons—the patient's lawyer, the court, and, potentially, the jury.

The fact of treatment and the time, length, and cost of treatment, at best, are only arguably "confidential communications" within Evidence Code Section 1012. (*See In re Lifschutz, supra,* 2 Cal.3d at 439, 85 Cal.Rptr. at 845, 467 P.2d at 557.) The treating doctor's diagnosis is a confidential communication. I would compel disclosure of the diagnosis because the disclosure is necessary to permit a defendant to decide whether that mental or emotional condition has some bearing upon the issues in the personal injury case and, at least in a preliminary way, to lay some foundation for his later motion to compel revelation of other confidential communications. Moreover, this information will also help the

defendant to decide whether to have the plaintiff examined and diagnosed by a psychotherapist of his own choosing.[6]

My narrowing of the waiver required by Section 1016 gives neither the patient-plaintiff full protection of his privacy nor the defendant evidentiary carte blanche. But the patient's constitutional right of privacy requires no less protection from intrusion, and a defendant's right to a fair trial would be unduly impaired with any lesser access to evidence.

Still available both to the patient-plaintiff and to the defendant is the trial court's sensitive application of the waiver test to the facts in a particular case, and the trial court's use of protective orders to prevent "annoyance, embarrassment or oppression." (Cal.Code Civ.Proc. § 2019(b)(1); *In re Lifschutz, supra,* 2 Cal.3d at 436–38, 85 Cal. Rptr. 844–45, 467 P.2d 557; *cf. Department of the Air Force v. Rose* (1976) 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11.)

In conclusion, the breadth of the waiver imposed by Evidence Code Section 1016 as construed and applied to require Dr. Caesar to reveal confidential communications with his patient protected by the patient's right of privacy exceeds constitutional bounds. I would reverse the order denying Dr. Caesar's habeas petition, with directions to grant the writ within thirty days unless the contempt order were earlier vacated by the California court.

---

**6.** The majority opinion assumes that diagnostic examinations of this kind will not provide adequate insight into the plaintiff's medical history effectively to protect the defendant's right to access to this information. The deposition of Dr. Hume shows that the assumption is unfounded in this case.