428 A.2d 126
In the Matter of PITTSBURGH ACTION AGAINST RAPE.

Appeal of Ann PRIDE, Administrator.

Supreme Court of Pennsylvania.

Argued Oct. 22, 1980.
Decided Jan. 23, 1981.
Reargument and Clarification Denied March 13, 1981.

16

Anne Lee Begler, Pittsburgh, for petitioner.

John Dean, Pittsburgh, for Keith Glover.

Lynn Marks, Philadelphia, amicus, for Women Organized Against Rape.

Kathryn Kolbert, Philadelphia, amicus, for Women's Law Project.

Robert L. Eberhardt, Deputy Dist. Atty., Pittsburgh, amicus, for Allegheny County.

Alan Meisel, John Burkoff, University of Pittsburgh Law School, Pittsburgh, for amicus, Civil Liberties Union.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellant Anne Pride is the director of the Pittsburgh-based "rape crisis center" known as Pittsburgh Action Against Rape (PAAR). She appeals from an order of the Criminal Division of the Court of Common Pleas of Allegheny County holding her in contempt of court for refusing to comply with a court order authorizing counsel for a defendant accused of rape to inspect that portion of a PAAR file which is purportedly a statement of the complaining witness.

At issue is the extent to which a court presiding over a rape trial may authorize counsel for the accused seeking to impeach the credibility of the complainant to inspect a rape crisis center file containing communications between the complainant and rape crisis center personnel. Appellant asks this Court to expand the common law of this Commonwealth to create an absolute privilege for all communications between PAAR personnel and persons seeking PAAR's assistance. Although we recognize the important societal interest in promoting such communications, we also recognize the compelling societal interest in the truth-seeking function of our system of criminal justice. In harmony with both the societal interest in promoting PAAR communications and the societal interest in the truth-seeking function of our criminal justice system, and consistent with the views of amicus Greater Pittsburgh Chapter of the American Civil Liberties Union and amicus Women Organized Against Rape, we hold that upon defense request a court should authorize defense inspection of only those statements of the complainant contained in the file which bear on the facts of the alleged offense. The court, however, must not permit defense inspection of statements of the complainant having no bearing on the facts of the alleged offense and relating instead only to the counselling services PAAR provides. The trial court shall not permit defense review of any other aspect of the file.

We remand to the trial court for proceedings consistent with this opinion.

## I. PAAR

PAAR is a private, non-profit corporation formed in 1974 which provides counselling to victims of rape and other forms of sexual assault. PAAR also provides educational programs. PAAR is one of twenty-seven such centers throughout this Commonwealth and, in appellant's estimation, "one of hundreds throughout the United States." Brief for Appellant at 6.

PAAR is funded, in part, by the federal Law Enforcement Assistance Administration (LEAA). LEAA funds permit a staff of five. In addition, about seventy volunteers maintain a twenty-four hour telephone line for what are termed "crisis calls." Appellant states that

"[t]he volunteers are extensively trained in rape-crisis counseling. They listen, offer support to those who call regardless of when crime occurred, and aid in providing the needed physical, psychological and social help."

Id.

According to appellant, once PAAR is contacted concerning a sexual assault, a PAAR staff member typically fills out a one-page intake form called an "Initial Report Form." See Appendix. Included in the Form are twelve sections addressing specific topics. The staff member identifies the following:

(1) Type of Assault

(2) Race and Sex of Victim

(3) Time Between Assault and PAAR Contact

(4) Neighborhood or Location of Assault

(5) Does Victim Know Actor?

(6) Age of Victim

(7) Approximate Length of Call

(8) Did Victim Receive Medical Care?

(9) Did Victim Report to Police?

(10) If Reported to Police, What is Disposition?

(11) What Services Did Victim Call For

(12) Caller Was

Appellant provides no other details concerning the contents of a typical client file. She states, however, that the Initial Report Forms

"are not for the purpose of obtaining the victim's statement in the legal sense. Attention is placed on the condition of the victim, both physically and psychologically. Also, the counselor inquires of the treatment the victim has received from various individuals and agencies that she or he has encountered in dealing with her/his crisis legally or medically. The information is used to ascertain the victim's medical and psychological needs and to monitor the various institutional systems that the victim may encounter. In most cases, if not all, the forms are filled in after talking with the client to avoid the atmosphere of direct questioning."

Brief for Appellant at 24.

## II. Criminal Proceeding

The contempt citation at issue stems from the case of *Commonwealth of Pennsylvania v. Keith Glover*, No. CC8002479. The accused is charged with rape, involuntary deviate sexual intercourse, indecent assault, simple assault, and terroristic threats for allegedly forcing the complainant, Mary Jane Weiss, to engage in sexual intercourse, including intercourse per os, at the complainant's apartment.

Trial commenced on July 10, 1980. At trial, the complainant testified that the accused, a chemistry classmate, entered her apartment on the understanding that she would help him with some chemistry problems. According to the complainant, upon completion of the problems the accused attacked her. On cross-examination, the accused sought to develop a theory of consent.

On both direct and cross-examination, the complainant testified that following the alleged attack she spoke with

PAAR personnel. In the presence of the jury, the accused sought to probe whether the victim had been "coached" by PAAR. The trial court sustained the Commonwealth's objection to such an inquiry in the jury's presence. The court, however, permitted the accused to proceed outside the presence of the jury.

During this proceeding, the court questioned Christine Corbett, who had been named by the complainant as a PAAR volunteer with whom she spoke. Corbett made no mention of the "Initial Report Form." Instead, she testified that, as a result of her discussion with the complainant, she filed a "medical advocacy report." Corbett described the report only as

"a statement as to what time I was called, what the circumstances were of the rape as related by the victim, and what is to happen with the case . . . ."

The following colloquy ensued between the court and Corbett:

"Q [By the Court]. So it is . . . a matter of routine an advocate for [PAAR] files a written report with [PAAR] setting forth facts which are told to that advocate by the alleged victim of the crime?

A [By Corbett]. A brief summary of it. If the victim does not always—we don't go in and ask for them to tell us what happened. If the victim volunteers information as to the occurrences during the rape, those will in outline form be on the form itself."

The court, however, did not inquire into what information, if any, complainant Weiss "volunteered."

The accused requested the court to order "production of any written reports of statements made by the alleged victim of this crime . . . which remain on file with [PAAR]." The court then requested appellant Pride to appear before the court with PAAR's file on this case to enable the court, *in camera*, to determine whether the file "must be available for inspection to protect the constitutional rights of the person accused of a crime."

Appellant honored the court's request. At the *in camera* hearing held July 11, 1980, the complainant consented to the trial court's review of the PAAR file.

No inquiry into the preparation or contents of the file appears on this record. Nor was the PAAR file made a part of the record. Only the following determination was made:

"This Court will find as a matter of fact after reviewing the statement recorded by Ms. Brown and Ms. Corbett [(PAAR personnel)] that statements are consistent with testimony made by Miss Weiss [(the complainant)] and would not give rise to a defense, would not give the defense grounds to cross examine on its basis of prior inconsistent testimony [sic]."

However, the court went on to agree with the accused that "the defendant and the defense have at all times the right to determine whether or not there are inconsistencies in prior statements given." Thus it ordered appellant to permit counsel for the accused

"to review only that portion of the report which was recorded by Ms. Corbett or Ms. Brown and purports to be a statement made by Miss Weiss on the alleged night—on the night of this alleged occurrence."

Upon appellant's refusal to comply, the court held her in contempt of court, remanding her to the Allegheny County Jail until she complied with the court's order.[1] PAAR's file remains outside the present record.

Appellant obtained a stay of the trial court's contempt citation from Mr. Justice (now Chief Justice) O'Brien of this Court. On August 26, 1980, this Court granted appellant's petition to assume plenary jurisdiction. Argument was expedited and heard on October 22, 1980.

### III. The Privilege

Appellant does not argue that any statute of this Commonwealth specifically accords privileged status to commu-

1. After a full colloquy, the court granted the accused's request for a mistrial as well as the Commonwealth's request for an extension of time in which to commence trial under Pa.R.Crim.Proc. 1100.

nications between PAAR personnel and persons seeking PAAR's assistance.[2]  Rather, as previously mentioned, appellant argues the common law should be expanded to include the claimed privilege.  See 8 Wigmore, Evidence § 2285 at p. 527 (McNaughton ed. 1961).  Such an expansion would, of course, absent the complainant's consent, foreclose even the *in camera* review of the PAAR file which was conducted here.

There is an undoubtable public interest in helping victims of rape to cope with inevitable disruption of emotional stability caused by the physical assaults they suffer.  There is an equally compelling public interest in encouraging victims of violent crime to come forward.  We would be closing our eyes to reality were we to discount the value of rape crisis centers in fostering these vital public interests.

It must be remembered, however, that our system of criminal justice is a search for truth.  As the Supreme Court of the United States observed, "disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." *Dennis v. United States*, 384 U.S. 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973 (1966).  Accord, e. g., *Lewis v. Court of Common Pleas*, 436 Pa. 296, 304 n.4, 260 A.2d 184, 189 n.4 (1969).  So too, the

2. Appellant would, however, borrow from the psychotherapeutic privilege considered by the various opinions expressed in *In re B.*, 482 Pa. 471, 394 A.2d 419 (1978).  See also *In re June 1979 Allegheny County Investigating Grand Jury*, 490 Pa. 143, 415 A.2d 73 (1980). The fact that the function performed by PAAR personnel resembles in some respects the function performed by a psychotherapist does not of itself persuade us that PAAR personnel's communications with a person seeking PAAR assistance should be absolutely privileged.  See *In re Cueto*, 554 F.2d 14 (2d Cir. 1977) (lay minister can claim no privilege); 2 Weinstein's Evidence ¶ 504[03] at p. 504–18 (1980) ("difficulty of drawing a line" explains exclusion of unlicensed practitioners from psychotherapeutic privilege under proposed Fed. R.Evid. 504).

We also disagree with appellant's suggestion that the federal statute, see 42 U.S.C. § 3771, and federal regulations, see 28 C.F.R. §§ 22.1 et seq., applicable to LEAA-related agencies such as PAAR somehow are dispositive.  There is nothing in the language of either the statute or the regulations which would put statements of the complainant sought by the defense here beyond the reach of the processes of a court conducting a criminal proceeding.

American Bar Association Project on Minimum Standards for Criminal Justice states: "Where life, liberty and protection of communities from crime are the stakes, gamesmanship is out of place." Standards Relating to Discovery and Procedure Before Trial § 1.1 Comment at p. 31 (Approved Draft 1970).

In a wide range of circumstances courts have sought to promote the truth-finding process. In *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), the Supreme Court of the United States permitted the Government's use of unlawfully obtained physical evidence to impeach an accused's false assertions on direct testimony.

> "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which the evidence in the Government's possession was obtained to his advantage, and provide himself with a shield against contradiction of his untruths."

347 U.S. at 65, 74 S.Ct. at 356. In *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), the Court held that the Government is entitled to review a defense investigator's report of statements made by prosecution witnesses which the defense plans to use for impeachment purposes. "Production of the report might substantially enhance 'the search for truth.'" 422 U.S. at 232, 95 S.Ct. at 2167, quoting *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (notice-of-alibi rule a constitutionally permissible device for assuring truthful defenses). Out of similar concern, this Court in *Lepley v. Lycoming County Court of Common Pleas*, 481 Pa. 565, 393 A.2d 306 (1978), upheld a trial court order requiring a defendant to make available to the prosecution his tape recording of the preliminary hearing testimony of a Commonwealth witness no longer willing to testify.

██ The truth-finding function of our system of criminal justice must circumscribe the absolute privilege appellant would have this Court create. We are guided by the admonition of Wigmore:

> "For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving and that any exemptions which may exist are distinctly exceptional...."

8 Wigmore, Evidence § 2192 at p. 70 (McNaughton rev. 1961). We are guided, too, by the "executive privilege" case of *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), where the Supreme Court of the United States unanimously refused to permit the former President's "generalized interest in confidentiality" of presidential communications to prevail over "fundamental demands of due process of law in the fair administration of criminal justice." The Court recognized that a claim of executive privilege is of constitutional dimension. It nonetheless upheld the federal district court's power to subpoena Presidential materials, stating, in the words of Mr. Chief Justice Burger, that:

> "[w]e have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense."

418 U.S. at 709, 94 S.Ct. at 3108. Like Wigmore, the Court said of privileges that "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in deroga-

tion of the search for truth." 418 U.S. at 710, 94 S.Ct. at 3108. Accord, *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1979) (discarding federal privilege against adverse spousal testimony); *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (rejecting first amendment privilege which would bar plaintiff in defamation action from inquiring into editorial processes of defendant where inquiry will produce evidence material to proof of critical element of action). See also *Kansas Comm'n on Civil Rights v. Sears, Roebuck & Co.*, 216 Kan. 306, 543 P.2d 1263 (1975) (although disclosure of customer credit ratings intrusive, intrusion justified to protect state interest in investigating claim of race discrimination in granting credit).

■ No less than in *Nixon*, where a president's claim of absolute privilege was rejected in favor of the Government's effort to obtain evidence, we must reject appellant's claim of absolute privilege. Indeed, at stake here is not only the public interest in the disposition of litigation on the basis of what Wigmore referred to as "every man's evidence," but also basic considerations of fairness to the accused seeking to defend against criminal charges. "We have consistently held that the prosecution must allow the defense to examine statements in its possession given by persons who testify as prosecution witnesses." *Commonwealth v. Grayson*, 466 Pa. 427, 428, 353 A.2d 428, 429 (1976). See also e. g., *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (right of confrontation paramount to state interest in protecting juvenile offender witness); *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968) (no legitimate state interest in denying defendant opportunity to question prosecution witness on real name and address). It would be unfair to erect a privilege that would deny the accused the opportunity at least to ascertain what the complainant previously has said. As Mr. Chief Justice Burger stated in *Nixon*, "[t]o ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." 418 U.S. at 709, 94 S.Ct. at 3108.

■ We caution immediately, however, that where, as here, the defense's basis for inspection of a PAAR file is to determine the existence of prior inconsistent statements, only "statements" of the complainant, and not interpretations or recollections of the PAAR counsellor, are to be made available. Statements of the complainant include only notes that are verbatim accounts of the complainant's declarations and notes that the complainant has approved as accurately reflecting what she said. As our Superior Court recently observed in a similar context, "[i]t would be unfair to permit impeachment of the witnesses through use of [a police] officer's interpretation of what [the witnesses] had said, not their own earlier recollections." *Commonwealth v. Hill,* 267 Pa.Super. 264, 270, 406 A.2d 796, 799 (1979). See e. g., *Commonwealth v. Wade,* 480 Pa. 160, 389 A.2d 560 (1978) (plurality opinion); *Commonwealth v. Hustler,* 243 Pa.Super. 200, 364 A.2d 940 (1976); *Commonwealth v. Bellis,* 252 Pa.Super. 15, 380 A.2d 1258 (1977), rev'd on other grounds, 484 Pa. 486, 399 A.2d 397 (1979).

■ The trial court should make whatever inquiry is necessary to determine whether matters contained in the PAAR file are indeed "statements." The trial court's inquiry must, of course, be conducted *in camera.* Little would be served by a judicial inquiry seeking to identify and protect important interests which is not itself structured to protect against improper disclosure.

■ It is not for the trial court to review these statements with an eye toward the utility or permissibility of their ultimate use at trial. In *Commonwealth v. Hamm,* 474 Pa. 487, 378 A.2d 1219 (1977), this Court made it clear that:

"[p]rior statements may, by themselves or in conjunction with other information known by the defense, open up valuable lines of cross-examination for the defense, even though the statements involve matters not directly relating to a witness' direct testimony. Accordingly, a standard which would permit the defense to examine only those prior statements in the possession of the Commonwealth which relate to a witness' direct testimony does not

truly grant the defense access to all the prior statements which might properly be employed in cross-examination. Again, only the defense can determine whether the statements are helpful; trial court review of the statements is inadequate. As this Court stated in *Commonwealth v. Grayson*, 466 Pa. [427] at 429, 353 A.2d at [428] 429:

'Whether the statements of the prosecution's witnesses would have been helpful to the defense is not a question to be determined by the prosecution or by the trial court. They would not be reading the statements with the eyes of a trial advocate engaged in defending a client. Matters contained in a witness's statement may appear innocuous to some, but have great significance to counsel viewing the statements from the perspective of an advocate for the accused about to cross-examine a witness.' "

474 Pa. at 501, 378 A.2d at 1226.

■ However, this is not to say that in every case the defense must be given all statements. We cannot rule out the possibility that statements contained in a PAAR file may have no bearing whatsoever on the facts of the alleged offense and may relate instead only to the valuable counselling services which PAAR provides. Such statements reflecting counselling shall be withheld from defense inspection.

■ Nor is the defense given a free hand to disseminate statements made available by the court. The statements are made available to counsel only for proper use in the defense of the accused. The important interests in providing emotional support to a victim of rape and in exposing and combatting violent crime may require the trial court to fashion appropriate protective orders to insure against improper disclosure or use of the statement(s) made available. See Pa.R.Crim.Proc. 305 F; American Bar Association Standards Relating to the Administration of Criminal Justice, Discovery and Procedure Before Trial Std. 11–4.4 (2d ed. 1978); see also *Commonwealth v. Hamm*, supra; *Kansas Comm'n on Civil Rights v. Sears, Roebuck & Co.*, supra, 216 Kan. at 321, 532 P.2d at 1275 (court "vested with authority

to issue such protective orders as it deems advisable to keep the information from prying eyes and to prevent its misuse").

## IV. Disposition

■ Our sole remaining task is to evaluate the present record to ascertain whether the court properly concluded that a statement of the complainant is contained in the PAAR file. As already mentioned, there is before us no record of the precise contents of the PAAR file subjected to the court's *in camera* review. While we do have a sample "Initial Report Form," we also have the testimony of PAAR volunteer Corbett that she filled out a "medical advocacy report." As Corbett described this latter form, it is not the same as the intake form. There is no indication from Corbett's testimony or from any other source that a statement of complainant Weiss is contained in the medical advocacy report.

We remand to the trial court for further consideration of its order in the light of this opinion. If the court concludes that any or all of the materials it directed appellant to turn over to defense counsel are statements of the complainant which do not relate only to counselling services, and thus are within the scope of permissible defense review, its order of contempt of court shall remain, subject to appellant's purging herself of the contempt. If, however, the court concludes that the materials it ordered appellant to make available are not statements of the complainant or are statements relating only to counselling services, and thus outside the scope of defense review, the court shall vacate its order of contempt. The stay granted by the Chief Justice is to remain in effect only until the trial court makes the determination required by this remand.

Case remanded for proceedings consistent with this opinion.

O'BRIEN, C. J., joins in this opinion and files a concurring opinion.

FLAHERTY, J., joins in this opinion and the concurring opinion of O'BRIEN, C. J.

LARSEN, J., files a dissenting opinion.

## APPENDIX

PITTSBURGH ACTION AGAINST RAPE:  INITIAL REPORT FORM

Upon completion mail to:  PAAR
Victim Service Coordinator
211 S. Oakland Ave., Pgh., 15213

Case Number _____
(For office use only)

### TYPE OF ASSAULT:

rape ____
attempted rape ____
involuntary deviate sexual
intercourse ____
sexual assault of a minor ____
indecent assault ____
incest ____
domestic violence ____
sexual harassment ____
indecent exposure ____
other _____

### RACE AND SEX OF VICTIM:

white female ____ male ____
black female ____ male ____
oriental female ____ male ____
Hispanic female ____ male ____
unknown female ____ male ____

### TIME BETWEEN ASSAULT AND PAAR CONTACT:

under 2 hours ____
under 12 hours ____
under 24 hours ____
under 72 hours ____
4 days to 1 week ____
over 1 week ____
over 1 month ____
over 1 year ____
ongoing ____
unknown ____

### NEIGHBORHOOD OR LOCATION OF ASSAULT:

_____
unknown ____

### DOES VICTIM KNOW ACTOR?

no _____ yes _____
unknown _____
if yes, relationship to actor

Do not include victim or callers name on top part of form.

HOTLINE WORKER _____
Date _____ Time _____ am/pm

### AGE OF VICTIM:

exact, if known ____
under 12 ____    adult 18–64 ____
under 18 ____    senior citizens ____
unknown ____

### APPROXIMATE LENGTH OF CALL:

under 10 min. ____ 30–60 min. ____
10–30 min. ____ over 60 min. ____

### DID VICTIM RECEIVE MEDICAL CARE?

no_____    unknown_____
yes, before PAAR contact ____
yes, after PAAR contact ____
what hospital or clinic? ____
what treatment did victim receive?

### DID VICTIM REPORT TO POLICE?

yes, before PAAR contact ____
yes, after PAAR contact ____
no ____
unknown ____

### IF REPORTED TO POLICE, WHAT IS DISPOSITION?

no arrest to date ____
charges dropped (by victim, D.A. or
    at preliminary hearing) ____
awaiting trial ____
unknown ____

WHAT SERVICES DID VICTIM CALL FOR:
medical information ____
police information ____
legal information ____
counseling info. or referral ____
emergency. shelter____
emergency transportation ____

to talk ____
for an advocate ____
other ____

CALLER WAS:
the victim ____  relative of vic. ____
victim's friend ____  police ____
medical personnel ____  other ____

' REFERRALS MADE:

VICTIM'S NAME _____  CASE # ____
ADDRESS _____  PHONE # ____

If different, caller's name _____
  caller's agency or affiliation _____
HOTLINE WORKER _____
DATE _____

O'BRIEN, Chief Justice, concurring.

The majority today rejects appellant's request that this court create an absolute testimonial privilege for communications between a rape victim and a rape crisis counselor. As I believe the majority's resolution of this issue is correct, I join in the majority opinion. While refusing to create an absolute privilege, the majority nevertheless does not allow the defendant complete access to appellant's files; the majority, however, fails, in my view, to adequately explain why only limited inspection is to be allowed. In my view, those portions of appellant's files which must remain confidential must remain so because of the victim's right to privacy. Hence, this concurring opinion.

The majority allows the defendant to inspect only those portions of appellant's files which contain factual statements of the victim relating to the alleged criminal episode. The majority specifically holds that those portions of the files containing statements relating to *counseling services* are

outside the scope of defense review. Thus, a defendant cannot review those portions of appellant's files which relate to the victim's innermost psychological reactions to the incident or her personal psycho-sexual history. I believe that the victim's constitutional right to privacy mandates non-disclosure of the aforementioned personal matters.

Article 1, § 1 of the Pennsylvania Constitution provides:

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."

As this Court stated:

"Clearly, the privacy interest of the patients which is implicated under the instant set of facts is the *interest in avoiding disclosure of personal matters. This privacy interest finds explicit protection in the Pennsylvania Constitution, Art. 1, § 1...."* In re June 1979 Allegheny County Investigating Grand Jury, 490 Pa. 143, 151, 415 A.2d 73, 77 (1980) (plurality opinion.) [1]

*See also, Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979); *Annenberg v. Roberts*, 333 Pa. 203, 2 A.2d 612 (1938).[2] As appellant argues, the victims of rape who seek the services of the rape counseling centers are protected, to some extent, by the right of privacy.

When presented with two conflicting constitutional rights, i. e., a defendant's Sixth Amendment right to a fair trial on one hand with a victim's right to privacy on the other, a court must balance both interests in an attempt to protect both parties. In effectuating such a balance, I would apply

1. Although only a plurality opinion, both Justices Larsen and Flaherty recognized the right of privacy in their dissenting opinions.

2. While the United States Constitution does not explicitly mention the right of privacy, numerous decisions have recognized the existence of the right. See *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) and cases cited therein.

the analysis employed by the majority and reach the same result.

FLAHERTY, J., joins in the Opinion of the Court and in the concurring opinion of O'BRIEN, C. J.

LARSEN, Justice, dissenting.

The immediate facts of this case are simple. The resolution is not simple, involving as it does, important conflicting rights of the victim and the accused.

The issue is whether this Court should recognize a testimonial privilege for communications made between a rape victim and a rape crisis center counselor. To my knowledge, this issue is one of first impression, not only in this Commonwealth, but also in the American system of jurisprudence. I agree with the position advocated by Ann Pride, appellant and administrator of Pittsburgh Action Against Rape (PAAR), and Allegheny County District Attorney Robert Colville, through their able counsel, Ms. Ann Begler and Deputy District Attorney Robert Eberhardt respectively, that the common law should be expanded to recognize an absolute testimonial privilege for all communications between rape victims and rape crisis center counselors, and accordingly voice my dissent. The facts are as follows:

Keith Glover was charged with rape, involuntary deviate sexual intercourse, indecent assault, simple assault, and terroristic threats. A jury trial was commenced on July 10, 1980 before the Honorable Ralph J. Cappy of the Court of Common Pleas of Allegheny County, Criminal Division. During cross-examination of the victim-complainant, defense counsel requested to examine the records of PAAR to ascertain whether or not she had made any prior statements to PAAR counselors which were inconsistent with her trial testimony.

Pursuant to that request, appellant Ann Pride was ordered to appear in court with the relevant records, which she did on July 11, 1980. With the consent of the victim, Judge Cappy conducted an *in camera* inspection and ruled, as a

matter of fact, that no prior inconsistent statements appeared in the records. Nevertheless, at defense counsel's insistence that he was entitled to view the records, Judge Cappy ordered Ms. Pride to allow defense counsel to examine PAAR's files. Since the victim withheld her consent, Ms. Pride refused to comply with that order and was consequently held in contempt of court. Chief Justice Henry X. O'Brien granted a stay of the contempt order on July 14, 1980 and this Court subsequently exercised its plenary jurisdiction to decide the matter.

Initially, there can be no serious doubt that courts have the common law authority to judicially create testimonial privileges. Any lingering doubts were laid to rest by our recent decision of *In re B, Appeal of Roth*, 482 Pa. 471, 394 A.2d 419 (1978) in which we recognized a non-statutory, psychotherapeutic privilege for communications made between a psychotherapist and his client. While I certainly agree with the majority's sentiments that exceptions to the general rule requiring full disclosure of all relevant evidence should not be lightly established, nevertheless it is clear that access to information is not without appropriate limitations. Mr. Justice Roberts expressed appreciation for such common law limitations in his concurring opinion in *In re B* wherein he recognized the ability of the common law to create testimonial privileges barring access to certain information. *Id.*, 482 Pa. at 489–90 n. 2, 394 A.2d at 428 n.2 (Roberts, J., concurring). As was well-stated by the Circuit Court for the District of Columbia in *Mullen v. United States*, 263 F.2d 275 (D.C.Cir.1959):

It is true that the trend of decisions has been chiefly in the direction of enlarging rather than restricting the area of admissibility of evidence, but the governing principle is the same. When reason and experience call for recognition of a privilege which has the effect of restricting evidence *the dead hand of the common law will not restrain such recognition.*

*Id.* at 279 (emphasis added) (common law expanded to recognize a testimonial privilege for communications made be-

tween a Lutheran minister and a member of his congregation who had sought "spiritual advice").

Privileged communications take various forms and are protected from disclosure for different reasons of social policy. They may be classed into three categories: (1) those designed to protect the individual, often the accused (*e. g.*, the privilege against self-incrimination or against having otherwise illegally-obtained evidence admitted); (2) those designed to protect the integrity of some system of government (*e. g.*, "executive privilege"); and (3) those designed to encourage freedom from fear of disclosure in persons partaking of certain relationships, the functions of which are deemed extremely important to society and which are dependent for their effectiveness on full mutual disclosure between the parties to the relationship (*e. g.*, attorney/client, priest/penitent, physician/patient). Fisher, *The Psychotherapeutic Professions and the Law of Privileged Communications*, 10 Wayne L.Rev. 609, 610 (1964) (hereinafter *Fisher*); *see also* McCormick, *The Scope of Privilege in the Law of Evidence*, 16 Texas L.Rev. 447 (1938) (hereinafter *McCormick* ).

Although we are here concerned with a privilege which would, if recognized, fall into the latter category, the majority opinion inexplicably focuses upon cases falling into the first two categories. While all three classes of privilege share a general aim—that is, all protect some interest or relationship which, for one or another social policy reason, are regarded as of sufficient value to society to justify the loss of some factual source of information to the administration of justice, *McCormick, supra* at 447–48, quoted in *Fisher, supra* at 610—the specific underlying policies justifying each class of privilege are significantly (and obviously) dissimilar, so as to seriously diminish the precedential value of authority dealing with the first two classes of privilege when considering a privilege ostensibly of the third variety.

The only cases cited in the majority opinion dealing with privileges justified by the relationship of trust between the parties, and the necessity for complete mutual disclosure of

information between them, are relegated to a footnote and the importance of these cases is summarily dismissed with the statement "[t]he fact that the function performed by PAAR personnel resembles in some respects the function performed by a psychotherapist does not of itself persuade us that PAAR personnel's communications with a person seeking PAAR assistance should be absolutely privileged." 494 Pa. 24 n.2, 428 A.2d 130 n.2. This similarity in function, when adequately scrutinized, coupled with many other considerations not addressed by the majority (discussed *infra*), are not only persuasive reasons, but, I am convinced, compelling reasons for judicial creation of an absolute rape victim/crisis counselor testimonial privilege.

While there have been a variety of historical justifications for many of the privileges in the third class, it is generally conceded today that the sole justification for such privileges is that the social utility of the particular relationship is so great that it outweighs society's interest in having all possible evidence disclosed in the litigation, Comment, *The Social Worker-Client Relationship and Privileged Communications*, 1965 Wash.U.L.Q. 362, 365 (hereinafter *Social Worker-Client Privilege*), and that the relationship depends for its existence upon strict confidentiality between the parties. 8 J. Wigmore, *Evidence* § 2291 at 549–53 (McNaughton rev. 1961) (hereinafter *Wigmore*).

> At present, there is one, and only one, justification—that the relationship is rendered ineffective either because a person is deterred from entering into it or because the person is frightened into non-disclosure during its course, and, that the effect of such an absence of the privilege is undesirable in light of the importance of the relationship to society. *Fisher, supra* at 611.

Thus, the two principal questions are whether the relationship is necessary to society and, if so, whether confidentiality is necessary to that relationship. *Social Worker-Client Privilege, supra* at 365.

These considerations have been succinctly set forth by Dean Wigmore in the form of four fundamental conditions:

(1) The communication must originate in confidence that it will not be disclosed.

(2) The element of confidentiality must be essential to the full and satisfactory maintenance of the relationship between the parties.

(3) The relationship must be one which, in the opinion of the community, ought to be sedulously fostered.

(4) The injury that would inure to the relationship by the disclosure of the communication must be greater than the benefit thereby gained for the correct disposal of litigation. *Wigmore, supra* at § 2285.

These four conditions have found wide acceptance as prerequisites to creating a testimonial privilege of the third category. *See, e. g., Social Worker-Client Privilege, supra* at 365 and cases cited at 365, n.19; *Fisher, supra* at 611; Comment, *Underprivileged Communications: Extensions of the Psychotherapist-Patient Privilege to Patients of Psychiatric Social Workers,* 61 Cal.L.Rev. 1050, 1056–57 and cases cited at 1057, n.36 (1973) (hereinafter *Underprivileged Communications*); *Mullen v. United States,* 263 F.2d 275, 280 (D.C.Cir. 1959); *State v. Driscoll,* 53 Wis.2d 699, 199 N.W.2d 851 (1972). Before discussing these criteria and applying them to the rape victim/crisis counselor relationship, I believe that an understanding must be had of the unique problems faced by the rape victim (as compared with the problems of victims of other crimes) in order to fully appreciate the unique and relatively recent response which has developed to help them, the rape crisis centers.

RAPE TRAUMA SYNDROME

A rape victim suffers an invasion of her bodily privacy in an intensely personal and unsettling manner, triggering a number of emotional and psychological reactions running the gamut from shock, fear, distrust and anger to guilt, shame and disgust. As victims of this violent crime are now finally beginning to receive some of the recognition and professional attention that has been so long denied them, the term "rape trauma syndrome" has developed to encompass the recurring pattern of post-rape symptoms. *See general-*

*ly*, Burgess and Holmstrom, *Rape: Crises and Recovery*, 33–47 (1979) *and* Brownmiller, *Against Our Will: Men, Women and Rape*, especially chapters 10 and 11 (Simon and Schuster 1975) (hereinafter *Brownmiller*). Dr. George G. Gardiner, Professor of Psychiatry at Hahnemann Medical College and Hospital in Philadelphia, describes the rape trauma syndrome in this way:

> The impact of rape on the victim is manifold. There is, for the victim, threat and actuality of physical harm that may cover the spectrum from bruises to maiming and death. In addition, there is the acute and severe loss of control by the victim over her circumstances. Furthermore, there is intrusion into her privacy in the most intensely personal way imaginable. As a result of the trauma of rape there are many different emotional reactions. Commonly one will find fear and panic based on what has actually happened or based on what might be imagined to happen as the result of a repeated attack. In addition, the individual may well feel shame and guilt over having been unable to prevent or stop the attack. Anger is a very common reaction and in addition there may be confusion. Very frequently the individual will have a period of depression, often occurring after an apparent period of stability. The range of short term and long lasting effects involves a number of mental disorders including, in rare individuals, the onset of psychosis, more commonly recognized as a "nervous breakdown". It is common experience that some of the more severe and long lasting disorders will frequently require long periods of psychiatric care and can be manifested by significant disability for the individual. A common aspect of rape is that the victim often feels isolated and helpless during and immediately after the episode. . . . During this phase a frequent phenomenon is that guilt and shame will make it quite difficult for the individual immediately to establish the ability to express herself completely.

Affidavit, Joint Brief for Amici Curiae, Women's Law Project and Women Organized Against Rape, Exhibit J.

This following illustrative and typical account of her trauma was given by a young Pittsburgh woman and printed in "A Handbook for Victims" (prepared by the Interagency Task Force on Rape Related Services, a special project administered by the Urban League of Pittsburgh, Inc.):

I experienced so much during those first two months: hurt, anxiety, anger, frustration, humiliation, and worst of all, the sense that I was having a nervous breakdown. I thought that my feelings were not normal. I couldn't even sleep with my husband—a man to whom I had been married for nine years. I couldn't understand what was happening. Would I ever be able to put this ordeal behind me?

A common symptom of rape trauma syndrome is self-doubt and agony over the role she—the victim—might have played in "bringing on" the rape. Susan Brownmiller addresses the cultural myths (the existence of which she has frightening evidence) that "she was asking for it" and "all women want to be raped" in her book *Against Our Will: Men, Women and Rape, supra.* She states:

"She was asking for it" is the classic way a rapist shifts the burden of blame from himself to his victim. The popularity of the belief that a woman seduces . . . a man into rape, or precipitates a rape by incautious behavior, is part of the smoke screen that men throw up to obscure their actions. The insecurity of women runs so deep that many, possibly most, rape victims agonize afterward in an effort to uncover what it was in their behavior, their manner, their dress that triggered this awful act against them. *Id.* at 312–13.

For example, a rape victim recounted "[f]or years afterward I felt it was my fault. I tried to figure out what had made him follow me. Was it the clothes I was wearing or was it my walk? It *had* to be my fault, you see? I was only a child—an innocent child, but I was ashamed for a long time." *Brownmiller, supra* at 361–62.

Such soul-searching and working-through of the traumatic event is essential to full recovery, but is inhibited by the

social stigma which, unfortunately, still attaches to the rape victim—family, friends and acquaintances frequently shun the victim, somehow blaming her (consciously or unconsciously) for her rape. A young rape victim explained "[a]fter that, it was all downhill. None of the girls were allowed to have me in their homes, and the boys used to stare at me on the street when I walked to school. I was left with a reputation that followed me throughout high school." *Id.* at 364.

The Honorable Abraham J. Gafni, of the Court of Common Pleas of Philadelphia County, accepted a negotiated guilty plea in the case of *Commonwealth v. Gray*, February Term, 1980, Nos. 748–678, a rape prosecution. Judge Gafni was moved to comment on and encourage the commendable behavior of the media (in attendance at the guilty plea hearing) in not revealing the names of the rape victims involved, and to comment on the "perceived need to be more concerned about and especially sensitive to the feelings of the rape victim." His eloquent statement on the basis for this need presents an enlightened view:

I believe that an honest analysis of the situation will reflect that the protective [media] shield placed around the rape victim results from a desire to deflect the special shame which is seen to attach only to victims of sexual crimes. Unlike the victims of any other crime, they are somehow suspected by society of being partially guilty; they are imagined to have contributed to the crime through some form of explicit or implicit seduction, or simply by not being as careful as they should have been. That these assumptions and suspicions are, in virtually all rape convictions, unwarranted, does not remove them from the conscious or subconscious minds of many.

In a statement reprinted in Note, *The Victim in a Forcible Rape Case: A Feminist View*, 11 Am.Crim.L.Rev. 335, at 351 (1973) (hereinafter *Note*), then Police Superintendent Robert Colville observed:

Rape is the only crime in which the victim is doubly violated, first by the attacker, and then by society. It is

the only crime in which social, religious, and cultural core attitudes of society turn upon the victim. In rape, society tends to blame or accuse the women.

This social stigma, although not universal to all cultures, has ancient roots. Many cultures ostracized the raped woman, finding her of little value to the society after she had been "tarnished." *See, e. g., Brownmiller, supra,* especially chapter 2, *In the Beginning It Was the Law* at 16–30 and chapter 3, *War, Bangladesh* at 78–86. Judge Gafni's statement continues:

In some countries, even today, women who have been raped are turned out by their families and no longer considered fit for marriage. In others, they are barred from marrying men of a priestly or noble class. Underlying this reaction, perhaps, is the ancient notion that women are chattel, property who, having been used and abused, are of a lesser value to the men who possess them.

In our society today, it is true that there are no legal impediments which attach to the victim of a sexual assault. She may marry any person and live in any community. Nonetheless, we still attach a stigma to rape victims and tell them that somehow they are lesser persons than they were before. Too often we read of husbands who are unable to accept or relate to wives who have been the subject of an attack, of parents who know or should know that their children are wholly innocent, but whose reactions impart a sense of guilt and shame rather than the love and affection which their children so desperately need. Even the community itself continues to view this victim as being somehow "tainted."

Judge Gafni applauded the media for its recognition of this social phenomenon and for acting with compassion toward the victim, finding the media's "special sensitivity" a necessary and welcome policy, considering the public perception of the rape victim.

The depth and range of emotional and psychological disturbance is not felt by the victims of most other crimes. Trauma is the natural consequence of *any* violent crime.

However, many of the symptoms of rape trauma syndrome will not be experienced with any degree of regularity by victims of non-rape crimes. Little anguish over the role the non-rape victim might have played is likely (except, perhaps, for a feeling that one might have been careless or gullible). Rarely is a robbery, or even assault, victim traumatized over possible contributory behavior. Certainly no social rebuke is forthcoming for the usual non-rape victim—society will not look askance at that victim (unless he/she were the aggressor) and ask what he/she did to "invite" the crime.

This whole problem has ramifications beyond the victim's plight. It must be remembered that the rape victim is in relationships with others in the role of mother, and/or daughter, and/or sister, and/or wife. The crime of rape not only traumatizes the victim but wreaks havoc upon these relationships and the individuals involved. The benefits of counseling to a rape victim are not just limited to the victim but inure to the benefit of those in these relationships with her, and unless the victims are encouraged and provided with an opportunity for therapy, many women and their relationships will be mere "shells." The legal recognition of a testimonial privilege for communications made between the rape victim and her rape crisis counselor is the judicial vehicle to provide and foster this needed rehabilitation and attendant hope.

LEGAL RESPONSE

This unique social/cultural response to the victims of sexual assault has been legally reflected in (and exacerbated by) the peculiar procedural laws which, until surprisingly recently, have governed rape prosecutions. "Male fear of the false rape charge brought by a lying woman . . . is written into the rape laws of various states in the form of special rules of evidence that are conspicuously absent from evidentiary rules governing other kinds of violent crime." *Brownmiller, supra* at 370 and *see* authority cited at 445.

Until recently, Pennsylvania had been one of the *most* "special" states in this regard. To begin, it is interesting to note that the complainant in a rape case has traditionally

been dubbed the "prosecutrix". To this writer's knowledge, such terminology has only been employed in prosecutions for rape. While the term "prosecutrix" is on the wane, it still crops up on occasion. *See, e. g., Commonwealth v. Seigrist,* 253 Pa.Super. 411, 385 A.2d 405 (1978).

Perhaps the most pernicious of the "special" rules were the corroborating evidence requirement, and the jury instructions cautioning the jury to evaluate the complaining witness' testimony with "special care in view of her emotional involvement" and the "difficulty of determining the truth with respect to alleged sexual activities carried out in private." 18 Pa.C.S.A. § 3106 (repealed by the Act of Nov. 21, 1973, No. 115, § 2). These measures have been attributed to Lord Chief Justice Matthew Hale, the seventeenth-century English jurist, who wrote: "Rape is an accusation easily to be made and hard to be proved, and harder still to be defended by the party accused, tho never so innocent." Hale, *History of the Pleas of the Crown,* vol. 1, 634 (R. H. Small 1847). It amazes me that "Lord Hale's instruction" had plagued the criminal prosecution system in Pennsylvania (and the "prosecutrix" as well) until 1973.

There was much more. Under the 1939 Penal Code, a defense to the crime of statutory rape read as follows:

"Upon the trial of any defendant charged with unlawful carnal knowledge and abuse of a woman child under the age of sixteen (16) years, *if the jury shall find that such woman child was not of good repute, and . . . was with her consent,* the defendant shall be acquitted of rape, and be convicted of fornication." Act of June 24, 1939, P.L. 872, § 721. (Repealed and replaced by the Crimes Code, Act of Dec. 6, 1972, P.L. 1482, No. 334)

This provision produced abominable and absurd results. For example, in the case of *Commonwealth v. Perry,* 199 Pa.Super. 379, 185 A.2d 809 (1962), a father had raped his 15 year-old daughter on a rural township road. The defendant, after denying having intercourse with his daughter, had sought to introduce evidence that his daughter was not of good repute and that she had consented to the sex act. The

trial court refused to allow such evidence. Incredibly, and consistent with precedent, the Superior Court unanimously reversed, holding there was reversible error in the trial court's refusal to permit the father to "blacken the daughter's character." Apparently, the Superior Court was influenced by the fact that "[t]he girl did not make any outcry, or effort to seek aid, although cars passed [on the rural road] during this occurrence." 199 Pa.Super. 380, 185 A.2d at 810. That a daughter's chastity could *ever* be considered relevant to *the father's rape* of a daughter and that the father could prove his own daughter's lack of good repute and her consent is beyond offensive—it is one of the most repugnant legal rulings of which I can conceive.

And until 1976, it was a defense to a corruption of minors charge and to an indecent assault charge for a defendant to prove by a "preponderance of the evidence that the alleged victim had, prior to the time of the offense charged, engaged promiscuously in sexual relations with others". 18 Pa.C.S.A. § 3104 (repealed by the Act of May 18, 1976, P.L. 120, No. 53, § 1). While technically not applicable to prosecutions for rape, "impeachment" of a rape victim by evidence of prior sexual promiscuity was frequently an effective tactic used by defense counsel. *See* Note, 15 Duq.L.Rev. 155, 160 (1976); *Commonwealth v. Crider*, 240 Pa.Super. 403, 361 A.2d 352 (1976). There were also prompt reporting mandates until 1976 prohibiting prosecution unless a complaint was lodged within three months of its occurrence, 18 Pa.C. S.A. § 3105 (repealed by the Act of May 18, 1976, P.L. 120, No. 53, § 1), and requirements of reasonable resistance by the victim, 18 Pa.C.S.A. § 3121(2) (repealed by the Act of May 18, 1976, P.L. 120, No. 53, § 2, 18 Pa.C.S.A. § 3107 (Supp. 1980–81)). *See Commonwealth v. Moran*, 97 Pa.Super. 120, 2 A.2d 517 (1929) (actual resistance, outcry and prompt complaint are material elements of rape), *and Commonwealth v. Perry, supra.*

These rules peculiar to rape prosecutions quite naturally have contributed to the frequent feeling on the part of the rape victim that *she* was on trial. Witness these statements made by two rape victims:

"They trotted out my whole past life, made me go through all these changes, while he just sat at the defendant's table, mute, surrounded by his lawyers. Of course that was his right by law, but it looked like I was the one who was on trial.

\* \* \* \* \* \*

"I don't understand it. It was like I was the defendant and *he* was the plaintiff. I wasn't on trial. I don't see where I did anything wrong. I screamed. I struggled. How could they have decided that he was innocent, that I didn't resist."

*Brownmiller, supra* at 372–73.

One of the chief sponsors of the 1976 amendments to Pennsylvania rape laws, Senator Robert Jubelirer of Altoona in Blair County, noted "[w]e should have . . . a situation now where the victim of the heinous crime of rape is no longer treated as the defendant and that the defendant can still receive a fair trial . . . ." *Legislative Journal-Senate*, p. 1462 (April 6, 1976). The gross inadequacy and unfairness of former law and practice, as applied exclusively to the crime of rape, is highlighted in the following item:

In urging the House of Delegates [of the American Bar Association] to approve a resolution calling for a redefinition of rape, Connie K. Borkenhagen of Albuquerque, New Mexico, pointed out one reason why most rape victims prefer not to press charges by imagining how it might sound if a robbery victim were subjected to the kind of cross-examination that the rape victim usually must undergo:

(Q.) "Mr. Smith, you were held up at gunpoint on the corner of First and Main?"

(A.) "Yes."

(Q.) "Did you struggle with the robber?"

(A.) "No."

(Q.) "Why not?"

(A.) "He was armed."

(Q.) "Then you made a conscious decision to comply with his demands rather than resist?"

(A.) "Yes."

(Q.) "Did you scream? Cry out?"

(A.) "No, I was afraid."

(Q.) "I see. Have you ever been held up before?"

(A.) "No."

(Q.) "Have you ever *given* money away?"

(A.) "Yes, of course."

(Q.) "And you did so willingly?"

(A.) "What are you getting at?"

(Q.) "Well let's put it like this, Mr. Smith. You've given money away in the past. In fact, you have quite a reputation for philanthropy. How can we be sure that you weren't *contriving* to have your money taken from you by force?"

(A.) "Listen, if I wanted . . . . "

(Q.) "Never mind. What time did this holdup take place, Mr. Smith?"

(A.) "About 11:00 P.M."

(Q.) "You were out on the street at 11:00 P.M.? Doing what?"

(A.) "Just walking."

(Q.) "Just walking? You know that it's dangerous being out on the street that late at night. Weren't you aware that you could have been held up?"

(A.) "I hadn't thought about it."

(Q.) "What were you wearing at the time, Mr. Smith?"

(A.) "Let's see . . . a suit. Yes, a suit."

(Q.) "An *expensive* suit?"

(A.) "Well—Yes. I'm a successful lawyer, you know."

(Q.) "In other words, Mr. Smith, you were walking around the streets late at night in a suit that practically advertised the fact that you might be a good target for some easy money, isn't that so? I mean, if we didn't know better, Mr. Smith, we might even think that you were *asking* for this to happen, mightn't we?"

The Legal Bias Against Rape Victims, 61 American Bar Association Journal 464 (1975) (report of the 1975 American Bar Association Midyear Conference).

These legal oddities seem to have been designed to protect the male defendant from false accusations by women who "cry rape." *Brownmiller, supra* at 370; *see generally* Drummond, *The Sex Paradox: An Analytical Survey of Sex and the Law in the United States Today* (Putnam 1953). "[T]he predominant interest seems to be protecting men from false complaints, not protecting females from being sexually assaulted or convicting those who are guilty of sexual assault." 3 Women's Rights Law Reporter 45, 54, Rutgers Law School, *Rape I* (1976). Perhaps this should not be surprising as the legal structure, from station house to bench, has been (and despite significant inroads continues to be) dominated by people who have been influenced by the myths of rape. It has been suggested that many law enforcement officials continue to cling to these myths ("all women want to be raped"; "she was asking for it"; "the woman will usually lie"—*Brownmiller, supra* at 311; Ross, *The Rights of Women: The Basic ACLU Guide to a Woman's Rights* 181–184 (1973)), doubting the victim's story perhaps because the crime was not reported immediately or because the victim appeared calm. As one rape victim phrased it, a woman must be "bruised, bloody, and damned near dead" in order for the sexual assault not to be considered consensual. *Note, supra* at 347. *See also Brownmiller, supra* at 365–68; Krasner, Meyer and Carrol, *Victims of Rape*, National Institute of Mental Health (1977) which analyzes a Philadelphia assault victim study made in 1973–75.

Many victims do not even bother to report a rape because they feel the process they must go through in order to obtain a conviction may be as offensive as the crime. *Note, supra* at 347. Most assuredly, many rape victims are treated kindly and professionally at the station house. However, the cultural myths still exist and still influence the handling of sexual assaults by the law enforcement agencies.

Victims who have received aid at the Rape Crisis Center in Washington, D.C. report a wide range of treatment by the

police. Some victims were satisfied with the treatment they received. At the other extreme were complaints about the police having made snide remarks, such as "How many orgasms did you have?," "I know why you got raped," or "Didn't I pick you up last week for prostitution?" Some of the police even harp over sexual details with relish—"How big was he?" and "What were you thinking about while he was doing it?" are questions victims have been asked. One woman said that although the rape was really bad, the police interrogation was six times as horrible. *Id.* at 347–48.

Small wonder that, given the imposing legal structure, rape ranks annually as the most underreported crime of violence in the United States. *Uniform Crime Reports*, Federal Bureau of Investigation 15 (Oct. 24, 1979).

There has *never been* a satisfactory rational justification for these unique legal barriers to a rape prosecution—indeed, none is possible. There is no reason to believe that a rape victim is more likely to "cry rape" falsely than is an assault victim to "cry assault" falsely or a robbery victim to "cry robbery" falsely.

This examination of the legal response to rape is not intended merely as an academic exercise. It is, rather, intended to emphasize the appalling truth that the law—the criminal justice system—has not been a mere passive observer to the legal injustice perpetrated upon the rape victim, or to the legal bonanza afforded the rapist. It is fitting, then, that the law generally, and this Court particularly, embrace this opportunity to help to rectify the imbalance, to actively and affirmatively encourage the physical and psychological treatment of rape victims and the reporting of the crime to the police. We can do this by recognizing an absolute privilege for all communications made in the rape victim/crisis counselor relationship.

## NEED FOR A RAPE VICTIM/RAPE CRISIS COUNSELOR PRIVILEGE

As was previously noted, the four fundamental conditions of Dean Wigmore provide a convenient and widely accepted

framework to analyze the necessity for a privilege. I shall apply each condition to the rape victim/rape crisis counselor relationship. The first is:

> (1) The communication must originate in confidence that it will not be disclosed.

The privileges recognized in the third category (*i. e.*, those designed to encourage full disclosure of confidential communications made between parties to a relationship viewed as extremely important to society in which full disclosure is essential to maximize the benefits of the relationship) all involve relationships in which one party confides information to the other with the understanding and expectation that the information will be kept confidential. Thus, the client confides fully in his attorney, secure in the knowledge that the information he discloses will be kept confidential; so too the penitent confides in his priest; so too the patient confides in his psychotherapist.

It is undisputed that communications between a rape victim and her rape crisis counselor are imparted in the utmost expectation of strict confidence. It is undisputed that in this case the victim was expressly advised that her communications to the PAAR counselor were made with the expectation that those communications would not be disclosed without her consent. PAAR is "billed" in brochures and leaflets as providing "confidential treatment—the victim has the exclusive right to decide who should be told." Moreover, PAAR requires each staff person to sign a confidentiality statement which provides that the PAAR member

> "agree[s] to treat as confidential the identity of and all information about every person who comes to or telephones PAAR for service, as well as all . . . records. I am aware that this identity and information is confidential. I further agree to exercise great care in protecting PAAR's records from any scrutiny by unauthorized persons." Brief for Appellant, Exhibit C.

Perhaps the strongest proof that the communications originated in confidence is the fact that Ann Pride, the appellant

herein and the administrator of PAAR, was prepared to face jail rather than violate the mutual trust of the relationship by breaching the assurances of confidentiality which PAAR gave the victim.

The second, and most important, condition of Wigmore's test is:

(2) The element of *confidentiality must be essential* to the full and satisfactory maintenance of the relationship between the parties.

As the majority noted, "the function performed by PAAR personnel resembles in some respects the function performed by a psychotherapist." 494 Pa. 24, n.2, 428 A.2d 130, n.2. This function is partially explained in the majority opinion:

"[PAAR] volunteers are extensively trained in rape-crisis counseling. They listen, offer support to those who call regardless of when crime occurred, and aid in providing the needed physical, psychological and social help.

\* \* \* \* \* \*

Attention is placed on the condition of the victim, both physically and psychologically. Also, the counselor inquires of the treatment the victim has received from various individuals and agencies that she or he has encountered in dealing with her/his crisis legally or medically. The information is used to ascertain the victim's medical and psychological needs and to monitor the various institutional systems that the victim may encounter. In most cases, if not all, the forms are filled in after talking with the client to avoid the atmosphere of direct questioning." (quoting from PAAR's brief).

As I agree that the functions performed by rape crisis center counselors are similar to those performed by psychotherapists (a similarity I will elaborate on *infra*), the case law and scholarly authority dealing with the psychotherapeutic relationship are instructive.

Mr. Justice Louis Manderino described the nature of the psychotherapeutic process in *In re B, supra*, 482 Pa. at 485, 394 A.2d at 425–26, wherein he stated:

The nature of the psychotherapeutic process is such that disclosure to the therapist of the patient's most intimate emotions, fears, and fantasies is required. As pointed out in appellant's brief,

"People usually enter psychotherapy because they have deep-seated conflicts and impairment of functioning which limit their ability to work effectively and to enjoy fully satisfying relationships with other people. To alleviate these blocks and conflicts, the therapist asks the patient to abandon 'rational thought' and to express thoughts and fears that may never have been revealed to anyone else. Indeed, these innermost thoughts are often so painful, embarrassing or shameful that the patient may never before have allowed himself to acknowledge them."

The patient in psychotherapy knows that such revelations will be expected if the process is to be beneficial. In laying bare one's entire self, however, the patient rightfully expects that such revelations will remain a matter of confidentiality exclusively between patient and therapist. *See, Caesar v. Mountanos,* 542 F.2d 1064 (9th Cir. 1976); *In re Lifshutz,* 2 Cal.3d 415, 85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1 (1970).

Confidentiality is not only expected in the psychotherapeutic relationship, it is *absolutely indispensable*! In recognizing the psychotherapeutic privilege, District Judge Wm. Matthew Byrne, Jr. speaking for the District Court of Hawaii, made the following observations:

This right to choose confidentiality is particularly crucial in the context of communications between patient and psychotherapist.

\*　　\*　　\*　　\*　　\*　　\*

The possibility that the psychotherapist could be compelled to reveal those communications to anyone . . . can deter persons from seeking needed treatment and destroy treatment in progress. . . . Many courts and commenta-

tors have concluded that, because of the uniquely personal nature of mental and emotional therapy, accurate diagnosis and effective treatment require a patient's total willingness to reveal the most intimate personal matters, a willingness that can exist only under conditions of the strictest confidentiality. *See* Statement of the American Psychiatric Ass'n before the Subcommittee on Government Information and Individual Rights, April 9, 1979 (further citations omitted). *Hawaii Psychiatric Society v. Ariyoshi*, 481 F.Supp. 1028, 1038 (D.Haw.1979).

Mr. Justice Clark, of the California Supreme Court, has identified three interests that are promoted by the assurance of confidentiality in the patient/psychotherapist relationship:

"First, without assurances of confidentiality, those requiring treatment will be deterred from seeking assistance." *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 39, 551 P.2d 334, 359 (1976) (Clark, J., dissenting). *See also Fisher, supra*, at 621–23; *Underprivileged Communications, supra*, at 1053; *Social Worker-Client Privilege, supra* at 381; American Association of Social Workers, *Principles of Confidentiality in Social Work* 4 (1964).

Second, the guarantee of confidentiality is critical in eliciting the patient's total willingness to reveal all of his/her innermost fears, feelings and anxieties and his/her most treasured secrets—in other words, it is essential to achieve the maximum benefit from the therapy. *Tarasoff v. Regents of University of California, supra* 131 Cal.Rptr. 39, 551 P.2d at 359. *See also Fisher, supra* at 619; Slovenko, *Psychiatry and a Second Look at the Medical Privilege*, 6 Wayne L.Rev. 175, 187–89 (1960).

Third, "even if the patient fully discloses his thoughts, assurance that the confidential relationship will not be breached is necessary to maintain his trust in his psychiatrist—the very means by which treatment is effected. 'The essence of much psychotherapy is the contribution of trust in the external world and ultimately in the self, modeled upon the trusting relationship established during therapy.' (Daw-

idoff, *The Malpractice of Psychiatrists*, 1966 Duke L.J. 696, 704)." *Tarasoff v. Regents of University of California, supra*, 131 Cal.Rptr. 40, 551 P.2d at 360. *See also Social Worker-Client Privilege, supra* at 381; *Underprivileged Communications, supra* at 1053.

In short, "[t]reatment of the mentally ill is too important, and the assurance of confidentiality too central to it, to risk jeopardizing the whole because of the relevance of some patient's statements to some legal proceedings." Goldstein and Katz, *Psychiatrist-Patient Privilege: The GAP Proposal and the Connecticut Statute*, 118 American Journal of Psychiatry 733, 735 (1962). Virtually every school of psychotherapy recognizes confidentiality as the *sine qua non* of effective therapy.[1]

Given that confidentiality is absolutely essential to the psychotherapeutic relationship, it still must be demonstrated that it is equally essential to the rape victim/crisis counselor relationship. Robert Fisher has observed the "revolution" in the 20th Century in the behavioral sciences—this revolution has spawned a variety of new "professions" designed to promote mental health and treat mental distress. *Fisher, supra* at 609. The approach he favors is to discard the

---

1. In the *Fisher* article, *supra* at 619, n.24, the author lists the following:

> 24. The Medical Value of Psychoanalysis, 41–42 (1936). Concurrence in what has been said, may be found in the writings of representatives of conflicting, often antagonistic, schools of personality theory. To mention some notable examples—*Freudian school*: Brenner, An Elementary Textbook of Psychoanalysis 8 (1957); Hall & Lindzey, Theories of Personality, 58–59 (1957); Freud, A General Introduction to Psychoanalysis, Nineteenth Lecture 298–99 (1956) (1st ed. in 1924 by Boni & Liveright); *Jungian school*: Jung, Contributions to Analytical Psychology, 286, 293 (1928). *Behavioristic school*: Shoben, Some Observations of Psychotherapy and the Learning Process, Psychotherapy-Theory and Research, 126, 137, 139 (Mowrer ed. 1953). *Rogerian, client-centered school*: Hummel, Ego-Counseling in Guidance: Concept and Method, 32 Harv.Educ.Rev. 463, 468 (1962); Rogers, The Concept of the Fully Functioning Person, Unpublished manuscript, reported in Hall & Lindzey, Theories of Personality, 475–76 (1957); Client-Centered Therapy, (1951). *Existentialist school*: Van Kaam, Counseling from the Viewpoint of Existentialist Psychology, 32 Harv.Educ.Rev. 403–05 (1962).

shop-worn tendency of the legal system to identify relationships calling for privileged confidential communications (*e. g.*, psychologist/patient, physician/patient) and to instead adjust our legal reasoning to facilitate new "professions" generated by the behavioral sciences revolution which are the functional equivalent of recognized psychotherapeutic professions. *Id.* at 612–16. It is the therapeutic *function* that the psychotherapeutic privilege is designed to protect— *not* a particular group of individuals; therefore, there is "little justification for extending privileged status to these [already recognized as privileged] groups but not to psychiatric social workers, when the job specifications of the latter also include administering therapy to psychologically disturbed people." *Underprivileged Communications, supra* at 1059.

Thus, Fisher would include, within the umbrella of the psychotherapeutic privilege, marriage counselors, school guidance counselors, and social case workers to the extent each is performing a psychotherapeutic function which relies for its effectiveness upon the assurance of confidentiality. *Fisher, supra* at 615–16. He defines this function as:

that relationship which exists between two persons (or more, where marriage counseling or group therapy is involved) where one (or more) is seeking help in the solution of a mental problem caused by psychological and/or environmental pressures from another whose training and status are such as to warrant other persons confiding in him for the purpose of such help. *Id.* at 617.

This functional approach was implicit in our decision in *In re B.*

Examining the nature of the relationship between rape victim and crisis counselor, it is apparent that relationship is the functional equivalent of the psychotherapeutic relationship and that the need for confidentiality is critical to that relationship. First, the information revealed to the counselor by the rape victim, often deeply embarrassed, guilt-ridden and stigmatized by society, is of an extremely sensitive nature. Such communications are likely to be among the most personal imaginable—the woman is traumatized not

only by the violence of the assault but by the offensive intrusion into her human sexuality, compounded by the unique social reaction to the victim as influenced by the cultural myths of rape. These revelations are certainly of a much more personal nature than a client's discussions of business matters with his/her attorney or even of a patient's discussions of physical conditions with his/her physician.

Second, there have been many affidavits submitted in this case—from victims, from crisis counselors, from law enforcement officials and from members of the medical profession. All of them stress the critical importance of confidentiality to the rape victim/rape crisis counselor relationship.[2] *See also Burgess and Holstrom, supra* at 126–27, 150–51.

A final factor necessitates the finding that communications made to rape crisis counselors should remain confiden-

---

**2.** The following excerpts are from a representative sampling of affidavits:

A. Affidavit of Patricia M. Hayes, Counseling Coordinator at PAAR. Brief of PAAR, Exhibit D. Ms. Hayes' statement discloses that nine PAAR clients have, since this case has been made public, asked for all records of contact with PAAR to be destroyed (with obvious destructive implications for the relationship). In addition, from January 1980–June 1980, the average percentage of anonymous calls was 37%. Following the media coverage of this case, 61% of emergency calls were anonymous, the callers afraid to trust PAAR to maintain confidentiality. One woman stopped all sessions because of anxiety over possible disclosure of her communications.

B. Affidavit of A. Kathryn Power, Executive Director of the Pennsylvania Coalition Against Rape. Joint Brief for Amici Curiae Women's Law Project and Women Organized Against Rape, Exhibit C. Ms. Power stated: "Knowledge and trust are the two key elements in the counseling relationship that allow the victim the flexibility and time to gather information, assess strengths, and regain the control that was lost."

C. Affidavit of Jan C. Grossman, Ph.D., a licensed psychologist familiar with both sexual assault victims and offenders. Joint Brief for Amici, *supra*, Exhibit P. Dr. Grossman stated:

My training and my experience both make it clear that the victim of sexual assault needs to be able freely to vent her feelings with somebody who can be trusted not to violate the promise of confidentiality. W.O.A.R.'s usefulness to thousands of rape victims would be seriously impaired if confidentiality cannot be assured.

D. Affidavit of Joseph A. Zeccardi, M.D., Emergency Department Director, Thomas Jefferson University Hospital, Philadelphia. Joint Brief for Amici, *supra*, Exhibit A.

tial. For a great number of women, especially the poor and much of the middle class, a rape crisis counselor is their only available psychotherapeutic assistance. If a woman of means is sexually assaulted, she may seek the effective but costly counsel of a psychiatrist or a psychologist, secure in the knowledge that all communications made to that psychotherapist will be held in the strictest confidence and will receive the full protection of the law. Those women who are less financially situated, however, do not have that alternative available to them and must, consequently, seek help where they can find it. The most accessible psychotherapeutic help for these women is the rape crisis counselor who in fact provides equivalent services. Withholding the privilege of confidentiality from the rape victim/rape crisis counselor relationship works an invidious discrimination against those unable to afford a psychologist or psychiatrist and will deprive these victims of their equal protection under the law. *Underprivileged Communications, supra* at 1059.

I find it indisputable that confidentiality is essential to the rape victim/rape crisis counselor relationship—both to en-

I am greatly concerned that confidentiality between the patient who was sexually assaulted and the WOAR counselor be assured. The patient needs to be able freely to ventilate the many confusing feelings resulting from the trauma. The relationship between sexual assault victims and WOAR counselors is akin to the relationship between individuals and members of the clergy or licensed psychologists. Trust in the confidential nature of the relationship is crucial to recovery.

E. Letter of Philip H. Schnabel, Chief of Police, Wilkinsburg Police Department. Brief of PAAR, Exhibit. "I strongly urge that the appeals court weigh the damage that will be done to not only victims, but to effective sex crimes programs should the confidentiality of victim statements be breached."

F. Affidavit of "D.P.", a Philadelphia rape victim. Joint Brief for Amici, *supra*, Exhibit I.

My heart felt like it was going to burst. Crying and talking with people I could trust helped to relieve the pressures. I needed to share feelings with people who would "keep my secret" for however long I needed them to. I trusted the women at Women Organized Against Rape. Being able to confide in these women helped me to overcome many barriers and fears.

courage victims to seek treatment which they might other-
wise avoid and to facilitate realization of the maximum
therapeutic benefit from that relationship.

Wigmore's third criterion assesses the importance of the
relationship to society, to-wit:

(3) The relationship must be one which, in the opinion of
the community ought to be sedulously fostered.

Indeed rape crisis centers are vital to the community and
have been industriously encouraged. As the majority notes:

There is an undoubtable public interest in helping victims
of rape to cope with inevitable disruption of emotional
stability caused by the physical assaults they suffer.
There is an equally compelling public interest in encourag-
ing victims of violent crime to come forward. We would
be closing our eyes to reality were we to discount the
value of rape crisis centers in fostering these vital public
interests.

494 Pa. 24, 428 A.2d 130.

The growth of the rape crisis centers has been rapid (there
are currently twenty-seven such centers in Pennsylvania).
In the Allegheny County area, an Interagency Task Force
on Rape-Related Services has been created—the number and
variety of participating organizations bespeaks the commu-
nity concern. Membership includes the Allegheny County
Coroner's Office; the Allegheny County Crime Lab; the
Allegheny County Medical Society; the Allegheny County
Police; the Center for Victims of Violent Crime; the Chiefs
of Police of Allegheny County; the Criminal Division, Court
of Common Pleas; the District Attorney's Office; Health
Systems Agency of Southwestern Pennsylvania; the Hospi-
tal Council of Western Pennsylvania; Pittsburgh Action
Against Rape; the Pittsburgh Police; People Concerned for
the Unborn Child; and, the Urban League of Pittsburgh.

The number and variety of the various community organi-
zations and individuals who have submitted amicus briefs,
affidavits and letters to this Court also indicate the impor-
tance of rape crisis centers to the community. Such support

includes law enforcement agencies and personnel, health organizations, members of the medical profession (nurses and doctors) and women's organizations such as various YWCA's. Media treatment too has been extremely supportive.

The substantial benefits of the community awareness and concern can be seen in the substantial increase in the number (and estimated percentage) of rapes reported since the advent and growth of rape crisis centers. The decade which has experienced this growth, the 70's, has seen a more than 100% increase in the number of rapes reported. *Uniform Crime Reports: Crime in the United States 1979,* William H. Webster, Director, FBI. This increase is not coincidental. National Institute for Law Enforcement and Criminal Justice (Law Enforcement Assistance Administration, U.S. Department of Justice), *Forcible Rape: A National Survey of the Response by Police* at 32 (March 1977); ABT Associates, *Rape: Guidelines for a Community Response* (1980) (cited in United States Department of Justice Release # 80–405, September 28, 1980).

Also of significance, in 1977, the first year PAAR received LEAA funding, there were 140 victims who availed themselves of PAAR's services. This number has since increased over 300% (1978—267 victims; 1979—400 victims; 1980— over 500 victims), according to PAAR's Annual Report. The substantial increase is a strong indication that the rape victim/crisis counselor relationship has been sedulously fostered by the community.

Wigmore's final condition balances the competing victim-defendant interests:

(4) The injury that would inure to the relationship by the disclosure of the communication must be greater than the benefit thereby gained for the correct disposal of litigation.

*Every* privilege carries with it an attendant loss of information available to the truth-seeking process. However, with each privilege, it has been determined that the concomitant benefit to the confidential relationship overrides the

loss to the litigation. As was stated in *Mullen v. United States, supra* :

> The benefit of preserving these [husband/wife; attorney/client; priest/penitent] privileges inviolate overbalances the possible benefit of permitting litigation to prosper at the expense of the tranquility of the home, the integrity of the professional relationship, and the spiritual rehabilitation of a penitent. *The rules of evidence have always been concerned not only with truth but with the manner of its ascertainment.*

263 F.2d at 280 (emphasis added). "[W]e must at times pay a price for justice *lest we do a greater injustice." Fisher, supra* at 625 (emphasis added).

Undoubtedly the interests of the defendant are great—the law must and does zealously insure that he receive a fair trial. The majority opinion has adequately enumerated those interests. I will therefore highlight the remaining factors in favor of non-disclosure. (Several others have already been advanced in the prior sections.)

First and foremost is the victim's right of privacy. Inherent in the expectations of confidentiality between a psychotherapist and his/her patient, or between a rape victim and her crisis counselor, is the constitutionally protected right of privacy. *see* Pa.Const. Art. I § 1. We concluded, in *In re B,* "in Pennsylvania, an individual's interest in *preventing the* disclosure of information revealed in the context of a psychotherapist-patient relationship . . . is constitutionally based." 482 Pa. at 484, 394 A.2d at 425. *See also Hawaii Psychiatric Society v. Ariyoshi, supra,* 481 F.Supp. at 1039. As should be apparent from the discussion of the trauma of a rape victim, nowhere does there exist a more pressing need for privacy than in the rape victim/crisis counselor relationship. This factor must weigh heavily in this balance of interests.

"A breach of this right of privacy occurs when the information is transmitted to another, whether or not that person

(the recipient) promises not to further transmit the information to others. It is knowledge of private and personal matters by another that is offensive—not that the knowledge may or may not continue on a course of travel to yet another eager ear." *In re June 1979 Allegheny County Investigating Grand Jury*, 490 Pa. 143, 154, 415 A.2d 73, 79 (1980) (from dissenting opinion of Justice Rolf Larsen). This breach is no less severe because an inspection of the confidential communication has been made *in camera*. Under the procedure required by the majority, the confidential disclosures would be made available to the trial court, and at that moment, the confidence is broken, the trust in the relationship is shattered. And, the more sensitive the nature of the communication, the greater the need for protection.

Moreover, even if the victim consents to letting the trial court view the crisis center records, what assurance does she have that it won't go beyond? If the court should determine that no information is available to the defense counsel, counsel will surely appeal the adverse ruling. As the inspection is *in camera* and without the participation of counsel, such an appeal would be almost automatic as counsel would have no other means of verifying the validity of the trial court's secret ruling. This appeal would necessitate transmittal of the records to the appellate court. Thus at least three more judges (a three judge panel of Superior Court) and their staff will have access to the confidential communications and will be required to review them. Further appeal is also quite possible and could result in review by seven members of this Court and their respective staffs which includes secretaries and law clerks.

The majority opinion attempts to limit the extent of the disclosure of PAAR's records to statements only of facts, and not "statements relating only to counseling services" or "interpretations or recollections of the PAAR counselor." 494 Pa. at 29, 428 A.2d at 132. I submit that the majority's

limitation will be difficult to apply. When the victim ruminates "I don't know. Maybe my dress was too tight. Maybe it was my fault" in a state of depression and shame, is that a statement bearing only on the facts of the offense, or a statement "reflecting counseling"? Surely the defense counsel would argue such statements are of "facts" relevant to the defense of consent. Many courts might err in favor of the defendant. It matters not that an appellate court later holds that the communications were *not* statements relating only to the facts—the damage would have been done and would be irreversible. This breach of privacy is intolerable, for no therapeutic relationship can even begin when there exists the threat of any breach of privacy or of confidence.

It is also important to remember that in almost all of the cases cited by the majority, one side or the other (the plaintiff/prosecution or the defendant) had information, or access to information, which the other side did not. In such situations, the majority is rightly concerned with unnecessary "gamesmanship" which should not play a part in the outcome of a prosecution. Here, it has been made clear that PAAR has not revealed—and *never does reveal*—the victim's communications to law enforcement officials. *All* rape crisis centers withhold their confidential communications with the victim from law enforcement agencies. Where the prosecution has received no benefit from the victim/counselor relationship (except incidental benefits in having a more stable witness), the majority's fears of "gamesmanship" are exaggerated and unwarranted.

For all of the foregoing, I am convinced that an absolute privilege should exist for confidential communications made in the rape victim/rape crisis counselor relationship. I would, therefore, reverse the trial court's order and remand for proceedings consistent with this opinion.

Since my position is, alas, only a dissent, I appeal to our legislature to take cognizance of the rape victim's plight and

to act promptly and compassionately in legislatively enacting a rape victim/rape crisis counselor testimonial privilege.